[Cite as *State v. Liles*, 2015-Ohio-3093.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 1-14-61

    v.

DEMOND D. LILES,                    O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2013 0472

**Judgment Affirmed**

Date of Decision: August 3, 2015

APPEARANCES:

    *Kenneth J. Rexford* for Appellant

    *Terri L. Kohlrieser* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, Demond D. Liles ("Liles"), appeals the December 2, 2014 judgment of the Allen County Court of Common Pleas, accepting his guilty plea and convicting him on four counts of Trafficking in Cocaine each with a vehicle forfeiture specification and one with a major drug offender specification, and sentencing him to a prison term of twenty-five years.

{¶2} On December 12, 2013, the Allen County Grand Jury returned a fifteen-count indictment against Liles stating the following charges: Count One: Trafficking in Cocaine, with a vehicle forfeiture specification, in violation of R.C. 2925.03(A)(1), (C)(4)(c), a felony of the fourth degree; Count Two: Permitting Drug Abuse, with a vehicle forfeiture specification, in violation of R.C. 2925.13(A), a felony of the fifth degree; Count Three: Trafficking in Cocaine, with a vehicle forfeiture specification, in violation of R.C. 2925.03(A)(1), (C)(4)(d), a felony of the third degree; Count Four: Permitting Drug Abuse, with a vehicle forfeiture specification, in violation of R.C. 2925.13(A), a felony of the fifth degree; Count Five: Trafficking in Cocaine, with a vehicle forfeiture specification, in violation of R.C. 2925.03(A)(1), (C)(4)(e), a felony of the second degree; Count Six: Permitting Drug Abuse, with a vehicle forfeiture specification, in violation of R.C. 2925.13(A), a felony of the fifth degree; Count Seven: Trafficking in Cocaine, with a vehicle forfeiture specification, in violation of R.C.

2925.03(A)(1), (C)(4)(f), a felony of the first degree; Count Eight: Permitting Drug Abuse, with a vehicle forfeiture specification, in violation to R.C. 2925.13(A), a felony of the fifth degree; Count Nine: Trafficking in Cocaine, with a vehicle forfeiture specification, in violation of R.C. 2925.03(A)(1), (C)(4)(e), a felony of the second degree; Count Ten: Permitting Drug Abuse, with a vehicle forfeiture specification, in violation of R.C. 2925.13(A), a felony of the fifth degree; Count Eleven: Trafficking in Cocaine, with both a vehicle forfeiture specification and a major drug offender ("MDO") specification, in violation of R.C. 2925.03(A)(1), (C)(4)(g), a felony of the first degree; Count Twelve: Permitting Drug Abuse, with a vehicle forfeiture specification, in violation of R.C. 2925.13(A), a felony of the fifth degree; Count Thirteen: Trafficking in Cocaine, in violation of R.C. 2925.03(A)(1), (C)(4)(f), a felony of the first degree; Count Fourteen: Permitting Drug Abuse, in violation of R.C. 2925.13(A), a felony of the fifth degree; Count Fifteen: Possession of Cocaine, in violation of R.C. 2925.11(A), (C)(4)(e), a felony of the first degree.

{¶3} The charges stemmed from Liles' participation in a series of controlled drug transactions for the sale of cocaine with a confidential informant. Liles subsequently entered a plea of not guilty to the charges and the case proceeded to discovery.

{¶4} On September 22, 2014, Liles appeared in court and pursuant to a

negotiated plea agreement withdrew his previously tendered plea of not guilty and entered a plea of guilty to Count One: Trafficking in Cocaine, with a vehicle forfeiture specification, a felony of the fourth degree; Count Five: Trafficking in Cocaine, with a vehicle forfeiture specification, a felony of the second degree; Count Seven: Trafficking in Cocaine, with a vehicle forfeiture specification, a felony of the first degree; and Count Eleven: Trafficking in Cocaine, with both a vehicle forfeiture specification and a major drug offender specification, a felony of the first degree. The prosecution dismissed the remaining eleven counts listed in the indictment as a result of the parties' agreement. As part of the plea deal, the prosecution specifically reserved the right to be heard at sentencing, but agreed not to make a sentencing recommendation.

{¶5} The trial court accepted Liles' guilty plea and entered a finding of guilt. The matter was continued for sentencing and the preparation of a pre-sentence investigation.

{¶6} On December 1, 2014, Liles appeared for sentencing at which time the trial court heard statements from the prosecutor, defense counsel, Liles, and persons speaking on Liles' behalf and in mitigation for sentencing purposes. The trial court sentenced Liles to a prison term of twelve months on Count One; a mandatory prison term of six years on Count Five; a mandatory prison term of seven years on Count Seven; and a mandatory prison term of eleven years on

Count Eleven.  The trial court ordered the prison terms to run consecutively for a total stated prison term of twenty-five years.

{¶7} Liles filed this appeal, asserting the following assignments of error.

### ASSIGNMENT OF ERROR NO. I
**THE SENTENCE SHOULD BE REVERSED AND REMANDED BECAUSE THE PROSECUTION BREACHED THE PLEA AGREEMENT, THEREBY DENYING TO MR. LILES DUE PROCESS OF LAW AS GUARANTEED TO HIM BY BOTH THE UNITED STATES CONSTITUTION AND OHIO CONSTITUTION.**

### ASSIGNMENT OF ERROR NO. II

**THE BREACH OF THE PLEA AGREEMENT BY THE PROSECUTION WAS PLAIN ERROR THAT THE TRIAL COURT SHOULD HAVE CORRECTED.**

### ASSIGNMENT OF ERROR NO. III

**TRIAL COUNSEL FOR THE DEFENSE WAS INEFFECTIVE FOR INSUFFICIENTLY OBJECTING TO THE BREACH OF CONTRACT BY THE STATE OF OHIO.**

### ASSIGNMENT OF ERROR NO. IV

**THE PROSECUTION ENGAGED IN PROSECUTORIAL MISCONDUCT BY ADVOCATING FOR A LENGTHY SENTENCE IN THE FACE OF A NEGOTIATED SETTLEMENT CALLING FOR NO SUCH ADVOCATING.**

### ASSIGNMENT OF ERROR NO. V

**THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES BECAUSE THE RECORD DOES NOT SUPPORT THE SENTENCING COURT'S FINDINGS THAT ARE NECESSARY TO IMPOSE CONSECUTIVE SENTENCES.**

{¶8} Due to their interrelated nature, we elect to discuss the first, second, third, and fourth assignments of error together.

*First, Second, Third, and Fourth Assignments of Error*

{¶9} In these assignments of error, Liles maintains that the prosecutor breached the plea agreement when he made remarks during the sentencing hearing advocating for a lengthy sentence after he agreed to make no sentencing recommendation. Liles asserts that the prosecutor's actions amounted to prosecutorial misconduct and affected his substantial rights because the prosecutor's comments improperly influenced the trial court's sentence. Liles also acknowledges that no specific objection was made to the prosecutor's statements regarding the length of sentence at the sentencing hearing, but urges this Court to reverse his conviction and sentence under a plain error review. Liles also claims that his trial counsel was ineffective for failing to object to the prosecutor's statements at the sentencing hearing.

{¶10} For its part, the State maintains that the prosecutor's statements at sentencing did not breach the plea agreement. The State highlights the fact that while it agreed to make no sentencing recommendation, it also expressly reserved the right to be heard at the sentencing hearing. The State maintains that the prosecutor's statements did not amount to a "recommendation" of sentence to the trial court and fell within the parameters of the plea agreement.

**{¶11}** We have previously held that "when a guilty plea 'rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.' " *State v. Crump*, 3d Dist. Logan No. 8-04-24, 2005-Ohio-4451, ¶ 10, quoting *Santobello v. New York*, 404 U.S. 257 (1971); accord *State v. McGinnis*, 3d Dist. Van Wert No. 15-08-07, 2008–Ohio–5825, ¶ 5. The State's failure to abide by the terms of the plea agreement entitles the defendant to either specific performance— i.e., the defendant's resentencing by a different judge, or withdrawal of his or her guilty plea. *McGinnis* at ¶ 5, *see also Santobello v. New York*, 404 U.S. 257, 263 (1971).

**{¶12}** The record demonstrates that in exchange for Liles pleading guilty on four counts with specifications, the prosecution agreed to dismiss the remaining eleven counts and specifications in the fifteen-count indictment. The "Negotiated Plea of Guilty" form detailed the four counts to which Liles agreed to plead guilty and stated the possible penalties corresponding to each count. The plea agreement form also contained a section with "check boxes" outlining the following:

> **NO PROMISES, THREATS OR COERCION. Defendant states this change of plea is not made under threat or coercion and that no promises have been made except: (check applicable representation)**
>
> ☐ **THE STATE OF OHIO WILL MAKE NO SENTENCING RECOMMENDATION**
> ☐ **THE STATE OF OHIO WILL REMAIN SILENT AT SENTENCING**

☐  **THE STATE OF OHIO WILL SEEK RESTITUTION**
☐  **THE STATE RESERVES THE RIGHT TO BE HEARD AT SENTENCING**
☐  **THE STATE RECOMMENDS THE FOLLOWING SENTENCE_____**
☐  **THE STATE IS/IS NOT OPPPOSED TO CONCURRENT SENTENCING**
☐  **THE STATE WILL NOT OBJECT TO JUDICIAL RELEASE**
☐  **THE PARTIES STIPULATE TO THE FOLLOWING SENTENCE**
☐  **OTHER_____**
☐  **A PRESENTENCING INVESTIGATION IS ORDERED**

(Doc. No. 125 at 2).

**{¶13}** The record indicates that the boxes "THE STATE OF OHIO WILL MAKE NO SENTENCING RECOMMENDATION" and "THE STATE RESERVES THE RIGHT TO BE HEARD AT SENTENCING" were checked along with the "OTHER" box which specified the term of Liles' bond, and the box indicating that "A PRESENTENCE INVESTIGATION IS ORDERED."

**{¶14}** At the change of plea hearing, the prosecutor described the portion of the plea agreement relating to the promises regarding its conduct at sentencing as follows: "Additionally, your Honor, we would indicate that the State would make *no specific recommendation* in this case. However, that the State would reserve the right to be heard at sentencing without *making such a recommendation*." (Doc. No. 157 at 2) (emphasis added). At sentencing, the prosecutor characterized

Liles' conduct as an "enterprise" and "the worst form of the offense" and made

statements advocating for the length of Liles' sentence.

> **\* \* \* I would submit to the Court that,** *without making a specific recommendation***, that certainly a longer sentence, a much longer sentence, is the appropriate sentence and anything less would demean the seriousness of this offense. In talking to the drug unit, these are the largest amounts of cocaine that the drug unit has bought and has been able to buy over the last ten years. The Court is well aware that the Court sits and hears these kinds of cases and looks at the amounts that are purchased and knows that these are the largest amounts that have been purchased over the last ten years. It is our belief that you owe it to the community to impose a very, very substantial sentence on this defendant. Thank you.**

(Doc. No. 158 at 8-9) (Emphasis added). Liles claims that the phrases "a longer

sentence, a much longer sentence" and "a very, very substantial sentence" in

conjunction with the prosecutor's use of the terms "enterprise" and "the worst

form of the offense" were tantamount to a sentencing recommendation.

Therefore, the initial question before us is whether the prosecutor's statements at

sentencing constituted a breach of the plea agreement.

{¶15} At the outset, we question the wisdom of using a "check box" system

to memorialize important promises made by the prosecutor as part of a negotiated

plea agreement. Moreover, the practice of marking multiple check boxes

representing a spectrum of conduct that the prosecution has agreed either to

engage in or to refrain from at sentencing in this instance only served to create

confusion by permitting the prosecution to select two options that are seemingly

inconsistent with one another. Specifically, it is unclear from the written plea agreement alone what exactly the prosecution promised when it merely checked the boxes both agreeing to "make no sentencing recommendation" and reserving "the right to be heard at sentencing." It is notable that even appellant's counsel at oral argument had trouble defining the parameters of the permissible conduct of the prosecutor under this promise.

{¶16} Nevertheless, the prosecutor's characterization of the plea agreement both at the change of plea hearing and at sentencing seems to suggest that the prosecutor believed the promise was not to make a "specific" sentencing recommendation—i.e., a term of years or "maximum" sentence, but that it was otherwise free to advocate for a harsher sentence without mentioning a quantifiable time period. However, the phrasing of the "check box" does not reflect the limitation of refraining only from making a "specific" sentencing recommendation. Moreover, to narrowly interpret the scope of the promise as the prosecutor contends effectively renders the actual language of "make no sentencing recommendation" meaningless.

{¶17} Therefore, based on the prosecutor's characterization of the plea agreement, it is our conclusion that when the prosecutor checked the box promising to "make no sentencing recommendation," the prosecutor was bound to refrain from making statements suggesting or intimating the length of the sentence that should be imposed as it did in this case. We are not persuaded by the

prosecution's argument that the vague reservation of "the right to be heard" adequately apprised the appellant that the promise to "make no sentencing recommendation" was modified in such a manner as to only restrict the prosecutor from advocating for a specific term of years at sentencing. Accordingly, we conclude that the prosecutor's statements to the trial court at sentencing "that certainly a longer sentence, a much longer sentence, is the appropriate sentence and anything less would demean the seriousness of this offense" and "[i]t is our belief that you owe it to the community to impose a very, very substantial sentence on this defendant" clearly overstepped the boundaries of the promise to "make no sentencing recommendation" and as such violated the plea agreement.

{¶18} Notwithstanding our conclusion regarding the breach, the analysis does not end here. As previously noted, Liles did not object to the prosecutor's statements at the sentencing hearing and thus we are limited to a plain error review.[1] *See Puckett v. United States*, 556 U.S. 129 (2009); *see also State v. Hartley*, 3d Dist. Hancock No. 5-14-04, 2014-Ohio-4536, ¶¶ 9-10. To establish plain error, Liles must point to an obvious error that affected the outcome of the proceedings below. *State v. Rohrbaugh*, 126 Ohio St.3d 421, 2010-Ohio-3286, ¶ 6. Reversal is warranted only if the outcome "clearly would have been different absent the error." *State v. Hill*, 92 Ohio St.3d 191, 203, 2001-Ohio-141. Notice of

---

[1] We reject Liles' initial argument on appeal that his trial counsel properly preserved the issue of the breach of the plea agreement for appellate review. The record simply does not support this assertion and accordingly, the plain error standard of review applies.

-11-

plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St. 2d 91 (1978), paragraph three of the syllabus.

{¶19} Arguably, the *outcome* at issue here is the sentence imposed. *See State v. Kline*, 2d Dist. Champaign No. 2009-CA-02, 2010-Ohio-3913, ¶ 5. Under this rationale, the question then would be whether Liles' sentence would have been different absent the breach. *See id*, citing *Puckett* at 142, n .4.

{¶20} However, Liles' appellate counsel asserted at oral argument that the prosecution's promise to refrain from making a sentencing recommendation *induced* him in to entering the plea agreement. It is our belief that this argument must also be considered in any plain error analysis of the circumstance before us. Therefore, in the interests of justice, we will also review whether the record supports Liles' claim that the prosecutor's breach undermined the knowing, intelligent, and voluntary aspects of his guilty plea as well as the possible impact the improper remarks may have had on the trial court's sentence in our assessment of whether plain error is present in this case.

{¶21} With regard to the plea, we note that in addition to the prosecutor's promise to make no sentencing recommendation, the plea agreement also called for the prosecution to dismiss eleven of the fifteen counts contained in the indictment in exchange for Liles' entering a guilty plea on the four counts with

specifications.  The record establishes that the prosecution satisfied this part of the agreement which resulted in a forty year reduction in the possible prison time Liles faced.  Specifically, prior to the plea agreement Liles was exposed to a possible prison term of eleven to seventy-one-and-a-half years, of which thirty years would have been mandatory time.  The plea agreement reduced the sentencing range to eleven to thirty-one-and-a-half years.  Clearly, the dismissal of the eleven counts, which included two first degree felonies and a second degree felony, was a significant part, if not *the* significant part, of the plea agreement.

{¶22} At oral argument, Liles' appellate counsel called our attention to the fact that the transcript from a bond hearing on September 4, 2014 indicates that Liles initially rejected the plea agreement involving the dismissal of the same eleven counts and the prosecution's reservation of the right to be heard at sentencing.  Over two weeks later, on September 22, 2014, Liles accepted the current plea deal.  Liles claims that the only difference between the two agreements was the addition of the prosecution's promise to refrain from making a sentencing recommendation.  Thus, Liles now asserts this as proof that his acceptance of the plea offer hinged on the prosecutor's promise to make no sentencing recommendation.

{¶23} However, the record reflects that there was no objection asserted either at the change of plea hearing or at sentencing when the prosecutor

characterized the promise as being limited to only refraining from making "a specific sentencing recommendation." And, notably, the prosecution still reserved via the checkbox, the "right to be heard" at sentencing just as it apparently did at the bond hearing. Moreover, there was no objection stated at sentencing to the prosecutor's statements infringing upon this promise, other than to the prosecutor's description of Liles' conduct as engaging in an "enterprise." Had the prosecutor's promise to make no sentencing recommendation been *so integral* to Liles' decision to accept the plea agreement, an objection surely would have been prompted at the moment the prosecutor began to overstep the bounds of the agreement. Thus, the absence of any such objection undermines the credibility of Liles' argument that he would not have entered into the plea agreement but for the prosecutor's promise to make no sentencing recommendation.[2]

{¶24} Next, we address whether the record supports Liles' contention that the prosecutor's breach of the agreement to make no sentencing recommendation improperly influenced the sentence imposed by the trial court. Liles repeatedly argues in his appellate brief that the "damage" is "obvious" simply because he was sentenced to a twenty-five year prison term with all but one year being mandatory time. (*See* Appt. Br. at 9). While Liles may disagree with the length of the trial

---

[2] It is notable that Liles' appellate counsel was not the same attorney at the trial court proceedings so any inference drawn from the addition of the prosecutor's promise to make no sentencing recommendation in the second plea offer and its effect on Liles' decision to accept the offer is purely speculative.

court's sentence, he fails to direct us to any evidence in the record indicating that the trial court would have sentenced him to a lesser term absent the prosecutor's improper remarks at sentencing.

{¶25} To the contrary, the record demonstrates that prior to sentencing at the change of plea hearing the trial court thoroughly explained the range of penalties available for each of the four counts, that three of the counts carried with them a mandatory prison term, and that the trial court was required to sentence Liles to eleven years in prison on Count Eleven due to the major drug offender specification. The following is an excerpt of the trial court's detailed discussion with Liles regarding the possible sentences prior to Liles entering his guilty plea.

> **Trial Court: Count eleven, again, with that major drug offender specification on there, there's no discretion left basically for me, it's mandatory, it's eleven. Case closed on count eleven. Do you understand that?**
>
> **Liles: Yes, sir.**
>
> **Trial Court: Alright. Now the other counts—and there's still play in terms of the length of the sentence, count one not being mandatory, but counts five, seven, and eleven are mandatory. Mandatory, again, means I have to sentence you, and when you're serving a mandatory prison sentence you are not eligible to be even considered for an early release from prison.**
>
> **So if there's ever been truth in sentencing on a mandatory sentence, you get what the sentence is; it's mandatory; you don't get out early; you have to serve that sentence.**
>
> **To put it all in perspective is, if—just for perspective purposes, if I sentence you to the maximum on every count—and the other thing I have to decide is whether these sentences would be**

**consecutive or concurrent. I could run different combinations; some consecutive to the other or concurrent. Concurrent means they'd be served at the same time; consecutive means they'd be all back to back to back to back to back—run wild some people call it. You understand that difference?**

**Liles: Yes, sir.**

**Trial Court: The worst possible case scenario for a prison sentence would be thirty-one and a half years; thirty of which would be mandatory. Do you understand that?**

**Liles: Yes, sir.**

**Trial Court: The best case scenario—I'll give you the best case scenario would be eleven years. Where I'd give you—I could give you the max on all of them but run them uh, concurrent. But I have to give you the eleven on count eleven because of the M-D-O. But I could give you the eleven on count eleven and give you anything on the other three there if I ran them concurrent, it'd still be eleven. Do you understand that?**

**Liles: Yes, sir.**

**Trial Court: So I've given you the best; I've given you the worst case scenario, and there's any number of different combinations depending upon the length of all the other sentences, and how much of it is concurrent. But again, on five, seven, and eleven no matter what, those sentences are mandatory. Do you understand that?**

**Liles: Yes, sir.**

(Doc. No. 157 at 8-10). As the trial court proceeded to discuss the issues of judicial release and community control, Liles asked a question prompting the following discussion.

-16-

**Liles:  So you [sic] saying I'm not gonna get community control for the first eleven years; that's what you [sic] saying?**

**Trial Court:  At the very least.**

**Liles:  Right.**

**Trial Court:  Yeah, I suppose technically, if I sentenced you to mandatory time on five, seven, and eleven, and I could sentence you to community control on count one that you would serve after your prison sentence on the other counts.  But you're also subject to post-release control—five years of post-release control on those other counts, or on count eleven, and the other felony of the first degree, count seven; you have to be on five years of post-release control.**

**So as a practical matter, you're not gonna get community control.  You could get prison on all counts except count one, and I could give you community control on count one, but that would sort of be not a practical solution because you're still gonna be on post-release control for five years after your prison sentences.  Is that making sense to you?**

**Liles: Oh, yeah, okay—yeah.**

**Trial Court: Count one's the only possible count you could get community control on. What I'm telling you is, you're not gonna get, as a practical matter, I mean, I suppose I could impose it.  It would have to wait until after your mandatory time and then you'd be on community control and post-release control at the same time—I guess technically speaking that could happen.**

**Defense Counsel:  You understand?**

**Liles:  Yeah.**

**Trial Court:  But you're not gonna get community control until you're done with your mandatory sentences on counts five, seven, and eleven.**

**Liles:  Right.**

> **Trial Court: And your question was right, because the best case scenario would be that that would be a mandatory eleven if I'd combine them all and make them concurrent—you'd have to do the eleven mandatory. But it could be eleven, eleven, and eight—it could be twenty uh, thirty years.**
>
> **I'm just trying—I'm not saying one way or another, I just want you—*I know you're considering the best case scenario; I don't want you to forget about the worst case scenario or anything in between that.* Understood?**
>
> **Liles: Yes.**

(Doc. No. 157 at 13-14) (emphasis added). Thus, despite Liles' focus on serving the least amount of time, the transcript from the change of plea hearing establishes that the trial court attempted to keep Liles mindful of all the possible sentencing scenarios, which included any combination between eleven and thirty-one-and-a-half years.

{¶26} The record reflects that, in addition to the prosecutor, the trial court heard statements from several people at the sentencing hearing, including statements from Liles and his supporters, who portrayed Liles as a positive role model in the community. After hearing the prosecutor's remarks at sentencing, which accounted for six pages of the forty-page transcript, the trial court engaged in a fifteen-page dialogue with Liles to ascertain his version of the events. During this discussion, the trial court noted that Liles' criminal record indicated that he had refrained from criminal activity for numerous years prior to being involved in

the instant case. The trial court appeared determined to seek a good explanation from Liles for why he decided to return to the drug trade when his criminal record had been relatively clean for numerous years. Liles, who at the time of the sentencing hearing was forty-five years old, admitted to his wrongdoing in the instant matter, but qualified his accountability by stating that he was a victim of circumstance.

> **Liles: * * * But, what the Prosecutor didn't say was there's nowhere in that file that anybody offered me help as a child. I don't know where I heard this from, but there's a saying "no child left behind." I can't speak for nobody else's child. But, I know I was left behind. Everything that I tried to do—I remember one day I tried to go up, when I was like eight years old, I rode my bike up to the Army place where you sign up to go to the Army, and they said, "You're too young to be in here." I said, "But I want to go to the Army." They said, "You're too young to be in here." So, I rode my bike back home. Ever since that point it's always been a letdown to try to get a job. I had a job at Dana. They walked me off in four days and said, "You've got a felony. You can't be here." I signed up for college. I got accepted. That was one of the best achievements, other than my kids, that I ever did. I was so happy. I was let down that they said, "You can't get federal funded [sic] because you have a drug case." There was so many times that I tried to better myself, but society wouldn't let me better myself. It's hard out there, even for somebody without a felony. So, just imagine what it is for somebody with a felony. You don't have the tools to become who you really are when you make mistakes and have to live with them. I tried that.**
>
> **Everything that he said [the prosecutor] as far as me catching cases, I done that. I'm guilty of it. Everybody makes mistakes. But, I'm God's child today and I stand on it. That's all I can say.**
>
> **Trial Court: Why did you turn back to selling drugs?**

**Liles: Your Honor, I definitely understand. I started developing low self-esteem. When every door got shut on me, every door got shut on me, I mean, it just came back to me. I guess it was always suppressed and I always tried to hide it by trying to do positive. If I could really show you my life of the things that I did, you would let me walk out that door right now today. You would. There was so many times that, and even the police know, there was so many times that I done jumped in front of teenagers with guns and made them put guns down from fighting that, I mean, I can't even count the times that I—**

**Trial Court: \* \* \* If it wasn't for individuals like you and, again, you're not the only drug dealer that's ever lived, but if you weren't the type that would go back and continue to sell, after having been punished before, maybe there's an addict out there that wouldn't have become an addict and then there's one less life that's ruined. So, you present a dilemma and it's a dilemma I see too often where on one hand the things you've done have destroyed lives and then I get in here at the time of sentencing and hear about all the positives that you've done. Those are inconsistent to me. Maybe I'm just a—I have a simple mind and I can't wrap my hands around how you can claim to do all this good and then at the back door doing all of this bad. It just doesn't make sense. Explain that to me. I mean—**

**Liles: You want me to explain how this came about?**

**Trial Court: Yea. Why are you selling again after your record?**

**Liles: Well, this is—I didn't know that I could actually go into what happened.**

**Trial Court: Well, it said in the P.S.I. it was something over you owed somebody some money for a motorcycle.**

**Liles: Right.**

**Trial Court: Now that, to me, is about the lamest excuse to sell drugs that I could ever hear.**

**Liles:  Well, I mean,—**

**Trial Court: Why don't you just not have the motorcycle?**

**Liles:  No, that's not the case of it, Your Honor.  I think you're reading it wrong.  I can tell you—**

**Trial Court:  All right.  Tell me.**

(Doc. No. 158 at 18-21).

{¶27} Liles then explained to the trial court that in the community he is known as an individual who can help people sell things like houses, cars, or other items by finding a purchaser and arranging a deal.  Liles stated that he was approached by an acquaintance, who also happened to be State's confidential informant, for assistance in finding a buyer for a motorcycle.  Liles found a buyer for the motorcycle for the asking price of $10,000.00.  Liles made $500.00 off of the deal.  After the transaction took place, the buyer discovered that the motor was damaged and not operable.  Liles stated that the buyer contacted him and demanded the return of his money.  Liles further stated that when the seller was unable to come up with the money, the buyer severely beat Liles and threated his life by saying that the next time he saw Liles he was going to shoot him.  Liles claimed he pleaded with the seller to get the buyer's money back and that the seller told him that the only way he could come up with the money was to sell drugs.  Liles agreed and engaged in the controlled drug transactions which were the subject of this case.

Trial Court:  You didn't know he was an informant.

Liles:  No.  I didn't know he was an informant.  But, I thought, at the time, I was saving my life and my kids life [sic].  If you look at the pictures on my phone where I got beat up, I got beat up real bad.  He didn't get beat up.  I did.  I did tell him that.  I said, "Y'all know that this is not my motorcycle.  You have his address on the title and everything.  Why don't you go talk to him?"   The only thing they said was, "You sold us the motorcycle.  It's not his problem."  I told this man from the beginning I'm not selling no drugs.  I know they got it on tape.

Trial Court:  Well, I think everybody in here wishes that you wouldn't have.  That's probably the one thing everybody has in common.

Liles:  Yes, sir.

Trial Court:  I hope.  Maybe there's some people in the Courtroom—

Liles:  Well, sir, if I may interrupt?  This man [the prosecutor] said that I'm a major drug offender.  I'm a major drug offender cause that's what they asked.  If you add the money up that they gave me, it never went over ten thousand and it never would have went over ten thousand because that was the sole purpose, in my head, to do it, was to get their money back.  I didn't sell to people on the street.  He gave me the money to get the drugs and I gave the drugs to him.  I told him—

Trial Court:  What did you think was going to happen with all these drugs?

Liles:  What I thought was going to happen was, in my head, he said, "You get the drugs," 'cause I told him, "I'm not selling no drugs."  He said, "You get the drugs, I'll sell them, and we'll keep the money until we get ten thousand and you give him his money back."

Trial Court:  What was going to—where were the drugs going to end up eventually?

> **Liles:  I definitely understand.**
>
> **Trial Court:  I mean, in the stream of commerce.**
>
> **Liles:  I definitely understand.**

(Doc. No. 158 at 24-25).

**{¶28}** Contrary to Liles' argument on appeal, the record does not indicate that the prosecutor's statements at sentencing improperly influenced the trial court's sentence in such a manner as to establish plain error.  Rather, the trial court's extensive dialogue with Liles at sentencing covering numerous pages and going well beyond the excerpts above, suggests that the trial court sought to understand Liles' perspective on the underlying circumstances leading up to him being arrested for selling a large amount of cocaine on the streets of his community where he claimed to be a positive role model.

**{¶29}** Given the attention devoted by the trial court to its conversation with Liles, it is far more likely that Liles' statements at sentencing had more of a profound effect on the trial court's sentence than the prosecutor's remarks. Notably, when defense counsel objected to the prosecutor's use of the word "enterprise," the trial court stated that "it's just argument at sentencing. Overruled.  Go ahead," further undermining Liles' contention that the prosecutor's improper comments had a significant impact on the trial court's sentence.  (Doc. No. 158 at 5).

{¶30} In sum, the record simply fails to substantiate Liles' claims that plain error exists either to negate the knowing, intelligent, and voluntary nature of his guilty plea or to establish that the trial court's sentence would have been any different had the prosecutor not breached the plea agreement.[3] Accordingly, Liles has failed to satisfy his burden that the outcome clearly would have been different absent the breach or that reversal of the sentence is necessary in order to prevent a manifest miscarriage of justice.

{¶31} Liles also argues that the prosecutor's breach amounted to prosecutorial misconduct and that his trial counsel was ineffective for failing to object to the prosecutor's improper remarks at the sentencing hearing. With regard to Liles' claim of prosecutorial misconduct, we again conduct a plain error review because Liles' trial counsel did not object to the prosecutor's improper remarks at sentencing. The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "To establish prejudice, a defendant must show that a reasonable probability exists

---

[3] We acknowledge that the Fifth Appellate District recently found no breach in a case where the written plea agreement stated that "the State agrees to make no recommendation and defer sentencing to the discretion of the Court. Both parties reserve the right to present arguments regarding sentencing at the sentencing hearing." At sentencing, the prosecutor recommended maximum consecutive sentences after the trial court specifically inquired if the State had a sentencing recommendation. *See State v. Morrison*, 5th Dist. Muskingum No. CT2014-0042, 2015-Ohio-2018, ¶¶ 8-9. The Court in *Morrison* noted that "the prosecutor made a recommendation only after the trial court inquired" in finding that the plea agreement was not breached. *Id*. at ¶ 14. The same circumstance is not present in this case. Despite this fact, we are compelled to note that the Court in *Morrison* also found no evidence that the prosecutor's sentencing recommendation negated the appellant's voluntary guilty plea or improperly influenced the trial court's sentence. *Id*. at ¶ 13.

that, but for the prosecutor's improper remarks, the result of the proceeding would have been different. Thus, '[n]ot every intemperate remark by counsel can be a basis for reversal.' " *State v. Porter*, 4th Dist. Meigs No. 10CA15, 2012-Ohio-1526, ¶ 20, citing *State v. Landrum*, 53 Ohio St.3d 107, 112 (1990).

**{¶32}** Even though we previously found that the prosecutor's comments regarding the length of the sentence breached the promise to refrain from making a sentencing recommendation pursuant to the plea agreement, the record does not support Liles' claim that the prosecutor's statements at sentencing prejudicially affected his substantial rights because he has failed to show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different. Accordingly, we find no grounds for reversal of the trial court's sentence on this basis.

**{¶33}** Next, we address Liles' claim that his trial counsel was ineffective for not objecting to the prosecutor's statements at sentencing. The standard of review for ineffective assistance of counsel is whether the representation of trial counsel fell below an objective standard of reasonableness and whether the defendant was prejudiced as a result of the deficient performance. *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Id.* To prove prejudice in the context of a guilty plea, the defendant must demonstrate there is a reasonable probability

-25-

that, but for his counsel's error, he would not have plead guilty and, instead, would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985).

**{¶34}** At the outset, we are reminded of the United States Supreme Court's statements regarding the requirement of an objection and the importance of strict adherence to the plain error standard under these circumstances:

> **For one thing, requiring the objection means the defendant cannot "game" the system, "wait[ing] to see if the sentence later str[ikes] him as satisfactory," and then seeking a second bite at the apple by raising the claim. For another, the breach itself will not always be conceded. In such a case, the district court if apprised of the claim will be in a position to adjudicate the matter in the first instance, creating a factual record and facilitating appellate review. Thirdly, some breaches may be curable upon timely objection—for example, where the prosecution simply forgot its commitment and is willing to adhere to the agreement. And finally, if the breach is established but cannot be cured, the district court can grant an immediate remedy (e.g., withdrawal of the plea or resentencing before a different judge) and thus avoid the delay and expense of a full appeal.**

*Puckett v. U.S.*, 556 U.S. 129, 140 (2009) (internal citations omitted).

**{¶35}** We have already determined that the prosecutor's statements made during sentencing did not prejudicially affect Liles' substantial rights. Thus, even if Liles can establish that his trial counsel should have objected, he cannot demonstrate the requisite prejudice to prove ineffective assistance of counsel.

**{¶36}** For all these reasons, we find Liles' claim of his trial counsel's ineffectiveness to be without merit. Based on the forgoing, the first, second, third, and fourth assignments of error are overruled.

*Fifth Assignment of Error*

**{¶37}** In his fifth assignment of error, Liles argues that the findings made by the trial court to impose consecutive sentences were not supported by the record.

**{¶38}** A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record; the sentencing statutes' procedure was not followed or there was not a sufficient basis for the imposition of a prison term; or that the sentence is contrary to law. *State v. Ramos*, 3d Dist. Defiance No. 4–06–24, 2007–Ohio–767, ¶ 23 (the clear and convincing evidence standard of review set forth under R.C. 2953.08(G)(2) remains viable with respect to those cases appealed under the applicable provisions of R .C. 2953.08(A), (B), and (C) * * *); *State v. Rhodes*, 12th Dist. Butler No. CA2005-10-426, 2006-Ohio-2401, ¶ 4; *State v. Tyson*, 3d Dist. Allen Nos. 1-04-38 and 1-04-39, 2005-Ohio-1082, ¶ 19, citing R.C. 2953.08(G).

**{¶39}** Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus; *State v. Boshko*, 139 Ohio App.3d 827, 835 (12th Dist. 2000). An appellate court should not, however, substitute its judgment for that of the trial court because the trial court is " 'clearly in the better position to judge the

defendant's dangerousness and to ascertain the effect of the crimes on the victims." ' *State v. Watkins*, 3d Dist. Auglaize No. 2-04-08, 2004-Ohio-4809, ¶ 16, quoting *State v. Jones*, 93 Ohio St.3d 391, 400 (2001).

{¶40} "Except as provided in * * * division (C) of section 2929.14, * * * a prison term, jail term, or sentence of imprisonment shall be served concurrently with any other prison term, jail term, or sentence of imprisonment imposed by a court of this state, another state, or the United States."   R.C. 2929.41(A). Specifically, R.C. 2929.14(C) provides in relevant part that:

> **(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:**
>
> **(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.**
>
> **(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.**
>
> **(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.**

{¶41} Both at the sentencing hearing and in the judgment entry, the trial court found that consecutive sentences were necessary to protect the public from future crime and to punish Liles. The trial court also found that consecutive sentences were not disproportionate to the seriousness of Liles' conduct and to the danger Liles posed to the public. The trial court observed that Liles' had not "responded favorably to the sanctions that were previously imposed, which include previous prison sentences." (Doc. No. 158 at 33-34). While acknowledging that Liles expressed some remorse and claimed to have done positive things prior to being arrested in this case, the trial court determined that Liles had not been rehabilitated to its satisfaction. The trial court also noted that Liles violated bond while awaiting the resolution of this case at the trial court level. With regard to the seriousness of the offense, the trial court found that Liles' participation in the drug transactions which involved a substantial amount of cocaine were done "for hire," or to raise money, and were part of an organized drug trade. Finally, the trial court found that R.C. 2929.14(C)(4)(b) and (c) applied to Liles' case.

{¶42} On appeal, Liles maintains that the trial erred in imposing consecutive sentences because "[t]he judge apparently ignored the fact that (1) the victim [the State] induced or facilitated the offense [by having the confidential informant who was the cause of the debt induce the sales to pay down the debt]

and (2) Mr. Liles had substantial grounds to mitigate his conduct, namely the fact that he was beaten severely and threatened with his life, only agreeing to this conduct because of these threats." (Appt. Br. at 23). Liles also argues that his lack of recent criminal convictions prior to his arrest in the instant case warrants a lesser sentence.[4]

{¶43} At the outset, there is no corroboration for Liles' story that he essentially participated in these drug transactions under duress due to a motorcycle deal gone awry. Moreover, it was well within the trial court's discretion to assess Liles' credibility as to this point and to accord the appropriate weight in consideration of sentencing. The record reflects that Liles' criminal record as a juvenile and younger man is extensive and includes a conviction for aggravated trafficking in drugs, in which he participated while on probation, and a conviction for extortion, for which he received a four-year prison term. Liles was also convicted in Federal Court for a Distribution felony case for which he was sentenced to sixty-three months in prison and was released in 2002.

{¶44} Even though Liles did not have a conviction for a serious offense in the years immediately leading up to the events underlying the present case, the trial court clearly found it troublesome that Liles could not only so easily "fall

---

[4] Liles also makes the claim that the average sentence in Ohio is 20-25% of what he received, or a 5-6.25 year prison term, in an attempt to make the trial court's sentence appear disproportionate to the seriousness of the offense. Without overtly questioning the accuracy of this claim, we note that the minimum prison sentence Liles could have received was 11 years due to entering a voluntary guilty plea to Count 11 which included a major drug offender specification. As previously discussed, the trial court thoroughly apprised Liles of the possible prison terms he faced prior to accepting his guilty plea. Thus, we are not persuaded by this argument.

back" into the drug trade, but also readily have access to such a substantial amount of drugs. (Doc. No. 158 at 31). The record also indicates that while Liles appeared to show some remorse, he nevertheless tempered the effect of this sentiment by blaming his conduct on being a victim of his circumstances. As noted by the trial court, it seemed inconsistent for Liles to tout his efforts toward stemming the violence afflicting his community while at the same time participating in conduct that only helped to further fuel the problem. Based on the record before us, we conclude that the trial court's imposition of consecutive sentences is supported by the record and find no basis for reversal of the sentence. Therefore, the fifth assignment of error is overruled.

{¶45} For all these reasons, the assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment Affirmed*

**ROGERS, P.J. and WILLAMOWSKI, J., concur.**

**/hlo**