[Cite as *State v. Gipson*, 2016-Ohio-994.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,            CASE NO. 1-15-51

     v.

DAVID T. GIPSON,                 **O P I N I O N**

     DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR20150142

**Judgment Affirmed**

**Date of Decision: March 14, 2016**

APPEARANCES:

     *Thomas J. Lucente, Jr.* **for Appellant**

     *Terri L. Kohlrieser* **for Appellee**

**SHAW, P.J.**

{¶1} Defendant-appellant David T. Gipson ("Gipson") brings this appeal from the July 9, 2015 judgment of the Allen County Common Pleas Court sentencing Gipson to an aggregate prison term of 54 months after Gipson was convicted in a jury trial of two counts of Domestic Violence in violation of R.C. 2919.25(A)/(D)(3), both felonies of the fourth degree, and one count of Theft from a Person in a Protected Class in violation of R.C. 2913.02(A)/(B)(3), a felony of the fourth degree.

*Relevant Facts and Procedural History*

{¶2} On April 16, 2015, Gipson was indicted for two counts of Domestic Violence in violation of R.C. 2919.25(A)/(D)(3), both felonies of the fourth degree due to Gipson having a prior Domestic Violence conviction, and one count of Theft from a Person in a Protected Class in violation of R.C. 2913.02(A)(3)/(B)(3), a felony of the fourth degree. All of the incidents allegedly took place between January 10, 2015, and January 26, 2015. The domestic violence incidents were allegedly perpetrated against Melissa W., and the Theft was allegedly perpetrated against Melissa's grandmother, Roxanne.

{¶3} On April 24, 2015, Gipson was arraigned and he pled not guilty to the charges.

{¶4} On July 6-7, 2015, a jury trial was held. At trial the State presented the testimony of four witnesses, which included Melissa W., the victim of the Domestic Violence offenses. Melissa testified that Gipson resided with her at her grandmother Roxanne's residence during the specified period in January of 2015. Melissa testified that she and Gipson were intimate, and that she loved Gipson. Melissa testified that during the time that Gipson resided with her there were multiple incidents where Gipson physically harmed her and she described those incidents for the jury. Melissa also testified to a separate incident wherein Gipson asked to clean her grandmother's rings, which were valuable, and Gipson never returned them. Carol Smith, Melissa's Aunt by marriage, testified that she witnessed one of the incidents of Gipson striking Melissa, and she also testified as to the value of Roxanne's rings based on appraisals that had been done in 1984 and 1991. Gipson's counsel cross-examined all of the State's witnesses but elected not to present any evidence. The jury returned guilty verdicts on all three charges against Gipson.

{¶5} The court then proceeded to sentence Gipson. The State recommended that Gipson serve maximum 18 month prison terms on each of the three charges, consecutive to each other, for an aggregate prison term of 54 months. The State based its argument primarily on Gipson's extensive criminal history, which included at least 8 prior felony convictions. Among those prior

felony convictions were another Theft from a Person in a Protected Class, specifically an elderly person, and multiple convictions for Forgery. Gipson's attorney gave a statement in mitigation, then Gipson himself made a lengthy statement to the trial court. Ultimately the trial court sentenced Gipson to serve 18 months in prison on each conviction, consecutive to each other, for an aggregate 54 month prison term.

{¶6} A judgment entry memorializing Gipson's sentence was filed July 9, 2015. It is from this judgment that Gipson appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT'S REQUEST FOR A DISMISSAL FOR LACK OF A SPEEDY TRIAL.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT ERRED IN PERMITTING THE STATE TO INTRODUCE A PELLET GUN INTO EVIDENCE THAT WAS NOT RELATED TO ANY OF THE CRIMES FOR WHICH APPELLANT WAS CHARGED.**

**ASSIGNMENT OF ERROR 3**
**APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE CONVICTIONS ARE BASED ON INSUFFICIENT EVIDENCE IN VIOLATION OF ARTICLE IV, SECTION 3 OF THE OHIO CONSTITUTION.**

{¶7} We elect to address one of the assignments of error out of the order in which it was raised.

*First Assignment of Error*

{¶8} In Gipson's first assignment of error, he argues that the trial court erred in denying his oral motion to dismiss the case based on speedy trial grounds, which he made on the morning his trial was scheduled to begin. We disagree.

{¶9} The right to a speedy trial is guaranteed by the United States and Ohio Constitutions. *State v. Adams,* 43 Ohio St.3d 67, 68 (1989). The statutory speedy trial provisions contained in R.C. 2945.71 *et seq.* "constitute a rational effort to enforce the constitutional right to a public speedy trial[.]" *State v. Pachay*, 64 Ohio St.2d 218 (1980), at syllabus. Pursuant to R.C. 2945.71(C)(2), a person charged with a felony must be brought to trial within 270 days of his arrest. However, pursuant to R.C. 2945.71(E), the "triple count provision," each day an accused is held in custody counts as three days for purposes of computing the speedy trial timeframe. *See also State v. Smith*, 6th Dist. Lucas No. L-14-1224, 2016-Ohio-150, ¶ 8.

{¶10} In this case Gipson was indicted on April 16, 2015, and a warrant was issued for his arrest the following day. The record indicates that the warrant was served on Gipson on April 18, 2015. Gipson was incarcerated until the trial date, which was July 6, 2015. Based on these dates Gipson was facially brought to trial less than 90 days from his arrest on the charges in the indictment under the triple count provision. In fact, after he was convicted, Gipson was given jail credit

for 80 days served. In addition, the record indicates that there were multiple tolling events, including Gipson's discovery demand, a request for a bill of particulars, and a joint agreement to continue the trial date two weeks.

{¶11} Under normal circumstances, our analysis could simply end with the fact that Gipson was clearly brought to trial within 90 days of arrest on the charges that are before this Court on appeal. However, Gipson claims that his speedy trial time should have run from when he was arrested on January 24, 2015, for a related incident against Melissa W., the victim in this case.

{¶12} According to some statements made on the record Gipson was charged with Aggravated Menacing stemming from an incident wherein he threatened Melissa with a pellet gun during the time that Gipson resided at Melissa's residence in January of 2015. At some point prior to the indictment in this case, Gipson apparently pled guilty to the Aggravated Menacing charge, *and* an unrelated Theft charge, which led to him being incarcerated for a total of 90 days. We stress that Gipson "apparently" pled guilty to the two crimes as the parties seemed to agree that this happened and that the 90 day jail sentence was served; however there is no documentation in the record specifically detailing precisely what the charges were or how long Gipson was incarcerated for the convictions.

{¶13} Nevertheless, Gipson claims that the misdemeanor Aggravated Menacing conviction he was arrested for on January 24, 2015, occurred in the same time frame as the Domestic Violence charges in this case and therefore his speedy trial time should have run from the time of the January arrest rather than the April indictment. To support his claim, Gipson cites *State v. Adams*, 43 Ohio St.3d 67 (1989), for the proposition that " '[W]hen new and additional charges arise from the same facts as did the original charge and the state knew of such facts at the time of the initial indictment, the time within which trial is to begin on the additional charge is subject to the same statutory limitations period that is applied to the original charge.' " *Adams* at 69, quoting *State v. Clay*, 9 Ohio App.3d 216, 218 (11th Dist.1983).

{¶14} We do not find Gipson's reliance on *Adams* persuasive to the case before us. *Adams* applies to a situation where new and additional charges arise from the "same facts" as the original charge. Multiple, different acts being committed over a period of days and weeks do not constitute the "same facts" simply because the facts are *similar* and the victim is the same. Moreover, it is not clear that the State knew of the additional domestic incidents committed by Gipson at the time of his arrest for Aggravated Menacing. Thus we do not find that *Adams* would compel a different result here.

{¶15} For all of these reasons we cannot find that Gipson's speedy trial rights were violated. Accordingly, Gipson's first assignment of error is overruled.[1]

### Third Assignment of Error

{¶16} In Gipson's third assignment of error, he argues that there was insufficient evidence presented to convict him and that even if there was sufficient evidence presented, his convictions were against the manifest weight of the evidence.

{¶17} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard,* 104 Ohio St.3d 54, 2004–Ohio–6235, ¶ 77, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Notably Gipson did not make a Crim.R. 29 motion for acquittal in this case either at the close of the State's evidence or at the end of the trial, therefore

---

[1] We note that despite his claim that his speedy trial rights had been violated in this case, Gipson was given 80 days of jail credit and he does not alternatively argue on appeal that he should have been given jail credit backdated to the January 24, 2015 arrest.

he has waived all but plain error with regard to the sufficiency of the evidence. *State v. Fugate*, 2d Dist. Montgomery No. 25782, 2014-Ohio-415, ¶ 20.

**{¶18}** The Ohio Supreme Court has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 10, quoting *State v. Thompkins,* 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Thompkins*, *supra*, at 387. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

**{¶19}** In this case Gipson was convicted of two counts of Domestic Violence in violation of R.C. 2919.25(A)/(D)(3), which reads,

> **(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.**

\* \* \*

**[D](3) Except as otherwise provided \* \* \* if the offender previously has pleaded guilty to or been convicted of domestic violence \* \* \* a violation of division (A) or (B) of this section is a felony of the fourth degree[.]**

{¶20} Gipson was also convicted of one count of Theft from a Person in a Protected Class in violation of R.C. 2913.02(A)(3)/(B)(3), which reads,

**(A)  No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:**

**\* \* \***

**(3) By deception;**

**\* \* \***

**[B](3) Except as otherwise provided \* \* \* if the victim of the offense is an elderly person \* \* \* [and] the value of the property or services stolen is one thousand dollars or more and is less than seven thousand five hundred dollars, theft from a person in a protected class is a felony of the fourth degree.**

{¶21} In order to convict Gipson of the crimes as alleged at trial the State called four witnesses including the alleged victim of the Domestic Violence incidents, Melissa W., who testified that she was 37 years old and that she lived with her grandmother Roxanne at 1001 Crestwood Drive in Lima.  Melissa testified that she took care of Roxanne, who was 90 years old and had dementia.

However, Melissa testified that she did not otherwise work because she had suffered a stroke and a head injury when she was younger.

{¶22} Melissa testified that she knew Gipson because she had been in a relationship with Gipson's brother previously. Melissa testified that throughout her relationship with Gipson's brother, and after the relationship ended, she regularly exchanged text messages with Gipson. According to Melissa, in early January of 2015 Gipson contacted her and she went and picked him up and brought him back to her residence. Melissa indicated that a relationship formed between Gipson and herself, which was intimate, and that Gipson resided with her from the night she picked him up until Gipson was arrested on January 24, 2015. Melissa testified that she and Gipson shared a room, that Gipson showered at her residence, that Gipson ate there, and that she bought him toiletries. Melissa also testified that Gipson regularly used her grandmother's car for transportation, that Gipson regularly used Melissa's cell phone, and that people regularly called her looking for Gipson. Melissa testified that she considered Gipson to be her boyfriend and that she loved him.

{¶23} Melissa then testified to three separate violent incidents that took place between herself and Gipson during the time Gipson resided with her. During the first incident, Melissa indicated that Gipson was cleaning the garage and she confronted him about her T.V. and laptop being missing. Melissa testified

that she had asked Gipson repeatedly what had happened to the T.V. and laptop, which went missing a few days after Gipson started staying with her. Melissa testified that when she asked Gipson again in the garage he "got mad and slammed [her] head against the garage wall and was choking [her]." (Tr. at 166). Melissa testified that it was painful. (*Id.*) This was the first incident for which Gipson was charged with Domestic Violence in this case.

**{¶24}** Melissa testified that a second incident occurred on a different day when she was watching a movie with her grandmother in the living room. Melissa testified that at some point she got up and went into the bedroom she shared with Gipson. Melissa testified that Gipson had a gun and "he put it up to [her] chin and he was choking [her] and he told [her] he was going to bust out [her] teeth and shave [her] head and he was going to kill [her] and bury [her] somewhere and [she would] be a missing person." (Tr. at 169). The gun that was held to her chin was entered into evidence and was actually identified as being a pellet gun rather than an actual firearm.

**{¶25}** Melissa then testified to a third incident that occurred on yet another day while Gipson resided with her. During this third incident, she testified that she was folding clothes and Gipson was punching her right arm and "slapping [her] around." (Tr. at 169). Melissa testified that as a result of the incident she had bruising on her arm. (Tr. at 178). Pictures of the bruising were entered into

evidence. This incident resulted in the second Domestic Violence charge being brought against Gipson.

{¶26} Melissa also testified about Gipson taking her grandmother Roxanne's rings. Melissa testified that Roxanne regularly wore jewelry, which included multiple rings. Melissa testified that one day while Gipson was staying with her Gipson asked to clean the rings that Roxanne wore. Melissa testified that Roxanne gave Gipson the rings, that Gipson cleaned the rings with a toothbrush, and that Gipson gave the rings back. However, Melissa testified that Gipson later stated that he needed to clean the rings again because they were dirty, so he again took them from Roxanne. Melissa testified that she was present both times when Gipson asked to clean Roxanne's rings. Melissa testified that the second time Roxanne gave Gipson the rings to clean, Gipson did not return them. Melissa testified that Gipson told her that he put the rings in acid in the garage. Melissa testified she went and looked for the rings but she could not find them.

{¶27} The State next called Carol Smith, who was Melissa's aunt by marriage. Carol was also Roxanne's daughter-in-law. Carol testified that she went to see Roxanne almost daily due to her dementia. Carol testified that she did Roxanne's bills for her and helped her with her pills.

{¶28} Carol testified that one day in January of 2015 she received a call from her daughter who indicated that Roxanne told her that the "bad man won't

get out" and that "he stole her rings." (Tr. at 210). Carol testified that she went over to Roxanne and Melissa's residence and spoke with Roxanne, who informed her that Gipson had taken her rings. Carol testified that she knew Roxanne wore rings, that some of them were valuable, and that two of them were from Roxanne's deceased husbands. Carol testified to appraisals of two of the rings in question indicating they were valued at $3,000 and $2,000 respectively. Carol testified that she asked Melissa about the rings and Melissa had indicated that Gipson said he was cleaning them. Carol testified that other jewelry was missing as well, including other rings, but the two rings were the most valuable and the only ones that had been appraised. Carol testified that she thoroughly searched Roxanne's residence and the garage for the rings but could not locate them.

{¶29} Carol also testified that she had been present during one of the alleged Domestic Violence incidents. Carol testified she observed Gipson strike Melissa in the arm as Melissa was folding laundry. Carol testified that Gipson "slugged" Melissa as hard as he could and that Melissa said aloud immediately that it hurt. (Tr. at 214). Carol testified that about five minutes later Gipson hit Melissa again so hard that he almost knocked her off her feet. (*Id.* at 214). Carol testified that Gipson struck Melissa with a closed fist. Carol testified that she did not call the police after this incident. However, Carol testified that she did call the police while she was at Roxanne's residence on the date she learned of Roxanne's

concerns that Gipson would not leave. Carol testified that she called the police to get them to come and remove Gipson. Before the police responded to that initial call, Carol called the police a second time when she learned from Melissa that Gipson may have had a gun. Carol testified that the police came and removed Gipson from the residence.

{¶30} The State also presented the testimony of Patrolman Shane Huber of the Lima Police Department, who was one of the officers that responded to the residence after Carol called the second time.[2] Patrolman Huber testified that while he was on duty on January 24, 2015, he was dispatched to 1001 Crestwood Drive for a dispute wherein one individual was possibly in possession of a firearm. Patrolman Huber testified that when he arrived at the residence officers were speaking with two women, one of whom was Melissa W., and Melissa informed Patrolman Huber that Gipson had threatened her with a gun and had threatened to kill her. Patrolman Huber testified that the officers on scene were given consent to search the residence and they located Gipson in bed in a bedroom he shared with Melissa. Patrolman Huber testified that he located a black pellet gun in the bottom drawer of a nearby nightstand. Patrolman Huber testified that he took Gipson into custody at that time.

---

[2] Patrolman Huber actually testified first in the trial but we present his testimony here to provide a clearer narrative.

{¶31} The final witness the State called was Detective Steve Stechschulte of the Lima Police Department. Detective Stechschulte testified that Gipson's case was assigned to him as a "felony theft from elderly" on January 26, 2015. (Tr. at 253). Detective Stechsculte testified that he spoke to Melissa, Carol, and Roxanne about Gipson and his time residing in Melissa and Roxanne's residence. Detective Stechschulte testified that despite her dementia, Roxanne was aware that her rings were missing. Detective Stechschulte testified that he spoke with Gipson and Gipson told him that he threw the rings away.

{¶32} Detective Stechschulte testified that he spoke with Melissa and she informed him of the incidences of violence. Detective Stechschulte testified that Melissa was emotional during the interview. Detective Stechschulte testified that he believed from his observations of Melissa that Melissa had low self-esteem and was lonely. Detective Stechschulte testified that despite the fact the relationship between Melissa and Gipson was not lengthy, it was not uncommon for people who were lonely and had low self-esteem to quickly grow attached.

{¶33} Detective Stechschulte also testified as to the type of things he looks for when determining whether someone is residing in a particular place for purposes of being a household member, which included, "clothing inside the house, how many nights they stay there, romantic attachment, anything that shows romantic attachment, and then obviously what the victims state that will put the

person there for multiple nights even if it is short term." (Tr. at 270). Detective Stechschulte testified that it is not uncommon for people to elect to reside together as fast as Melissa and Gipson had. (*Id*. at 271).

**{¶34}** Detective Stechschulte also testified that Gipson had a prior conviction for Domestic Violence in 2002, and a certified copy of the judgment entry indicating that conviction was introduced into evidence. At the conclusion of Detective Stechschulte's testimony, the State rested its case.

<u>Domestic Violence Convictions</u>

**{¶35}** On appeal Gipson now argues that there was insufficient evidence to convict him of both counts of Domestic Violence and that his convictions were against the manifest weight of the evidence. Gipson specifically argues that the State did not establish that Gipson was a "household member." Gipson does not contest any of the remaining elements of his domestic violence convictions.

**{¶36}** Household member is defined in R.C. 2919.25(F)(1) and (F)(2) as follows.

> **(1)  "Family or household member" means any of the following:**
>
> **(a)  Any of the following who is residing or has resided with the offender:**
>
> **(i)  A spouse, a person living as a spouse, or a former spouse of the offender;**

**(ii) A parent, a foster parent, or a child of the offender, or another person related by consanguinity or affinity to the offender;**

**(iii) A parent or a child of a spouse, person living as a spouse, or former spouse of the offender, or another person related by consanguinity or affinity to a spouse, person living as a spouse, or former spouse of the offender.**

**(b) The natural parent of any child of whom the offender is the other natural parent or is the putative other natural parent.**

**(2) "Person living as a spouse" means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question.**

{¶37} Although the statute does not define "cohabitation" as it is used in R.C. 2919.25(F)(2), the Supreme Court of Ohio has construed the statutory term to be comprised of two essential elements " '(1) [the] sharing of familial or financial responsibilities and (2) consortium.' " *State v. Carswell,* 114 Ohio St.3d 210, 2007-Ohio-3723, ¶ 35, quoting *State v. Williams,* 79 Ohio St.3d 459 paragraph two of the syllabus.  The Ohio Supreme Court further explained that, " 'Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations.' " *Id*. quoting *Williams* at 465.

{¶38} In this case the testimony at trial indicated that Gipson began residing with Melissa at the residence she shared with Roxanne on approximately

January 10, 2015. Melissa testified that she and Gipson were intimate, that he stayed in her bedroom, and that she loved him. Melissa also testified that she cooked daily for Gipson and that she provided him with toiletries. In addition, Melissa testified that after Gipson began staying with her, she went with Gipson to his prior residence to get Gipson's clothes. Melissa also testified that Gipson had people regularly call her phone if they were looking for him. Melissa specifically testified that "when [Gipson] moved in he had my cell phone all the time." (Tr. at 176). Gipson also used Melissa's grandmother's car as his primary mode of transportation, and he clearly did some household duties such as cleaning out the garage.

{¶39} In addition to Melissa's testimony, Detective Stechschulte testified that during his investigation into Gipson's crimes, he never found any information to show that Gipson was living anywhere other than 1001 Crestwood during the time frame alleged in the indictment.

{¶40} Based on the testimony we find that sufficient evidence was presented to convict Gipson based on him being a "household member." At the very least, we cannot find that plain error existed in this case. Moreover, while Gipson does not challenge the remaining elements of his Domestic Violence convictions, we would note that there was sufficient evidence presented to support those elements as well.

{**¶41**} Similarly we cannot find that Gipson's convictions for Domestic Violence were against the weight of the evidence. Gipson makes the same arguments related to sufficiency that he does to manifest weight, contending that the State did not adequately establish that he was a "household member." Melissa's testimony established that Gipson resided with her, that she provided his food and toiletries, that his clothes were at her residence, that she and Gipson were intimate, and that she loved Gipson. Gipson put forth no contrary evidence to establish that he was living elsewhere during the time frame established by the State, relying only on the initial police report that stated Gipson's address was elsewhere; however, this was explained by the officers who testified. The officers indicated that if someone had previously been in contact with law enforcement, as Gipson had, officers often did not update the address in their system when preparing a new report.

{**¶42**} Based on the evidence in the record we cannot find that the factfinder clearly lost its way in convicting Gipson of both counts of Domestic Violence or that there was a manifest miscarriage of justice. Therefore, Gipson's arguments related to the Domestic Violence convictions are not well-taken.

Theft from a Person in a Protected Class

{**¶43**} Gipson next claims that the State presented insufficient evidence to convict him of Theft from a Person in a Protected Class, and that his conviction

was against the manifest weight of the evidence. Gipson contends that there was no direct evidence that he stole Roxanne's rings and that the evidence against him was based on "conjecture."

{¶44} Contrary to Gipson's arguments, Melissa specifically testified that she was present when Gipson asked to clean Roxanne's rings the second time. Gipson took the rings from Roxanne and made several statements that they were in the garage in "acid." Both Melissa and Carol testified that they could not find the rings when they looked for them. The house and garage were thoroughly searched and the rings were not located. When Gipson was questioned about the rings by Detective Stechschulte, Gipson stated that he had thrown them away.

{¶45} In addition, there was clear testimony as to the value of two of the rings, having been appraised in 1984 and 1991 for a total of $5,000. Detective Stechschulte actually testified that due to the increase in the value of gold and diamonds, the rings were likely actually worth more than their dated appraisals. Finally, there was clear testimony that Roxanne was well over the age of 65.

{¶46} On the basis of this testimony, we cannot find that there was insufficient evidence to convict Gipson of Theft from a Person in a Protected Class, or that his conviction was against the manifest weight of the evidence. Therefore, Gipson's argument is not well-taken, and his third assignment of error is overruled.

*Second Assignment of Error*

**{¶47}** In Gipson's second assignment of error, he argues that the trial court erred in admitting the pellet gun into evidence. Specifically, Gipson contends that the incident in which Gipson used the pellet gun to threaten Melissa was not an incident before the jury for determination and thus the pellet gun was irrelevant and prejudicial.

**{¶48}** A trial court has broad discretion with respect to the admission of evidence. *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). An appellate court will not overturn the decision of a trial court regarding the admission of evidence absent a clear abuse of discretion that produced a material prejudice to the defendant. *State v. Roberts*, 9th Dist. Summit No. 21532, 2004-Ohio-962, ¶ 14. An abuse of discretion is more than an error of judgment, it means that the trial court's ruling was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶49}** In this case the State introduced a pellet gun as an exhibit at trial when Patrolman Shane Huber was testifying. Patrolman Huber testified that he had been dispatched to the residence where Gipson was staying and was informed that Gipson may have a weapon. Patrolman Huber testified that he located the pellet gun in a dresser beside the bed in which Gipson was sleeping. The pellet gun was later referenced again in Melissa's testimony, where she indicated that the

weapon was the one that Gipson threatened her with. It was then referred to again in Detective Stechschulte's testimony.

{¶50} The State argues on appeal that the pellet gun, and the incident in which Melissa was threatened with it, was relevant to show the "intent" of Gipson when he choked her and struck her on the other occasions that were actually before the jury. The State contended that the incident with the pellet gun was also used to show the "absence of mistake" in Gipson's actions. Gipson attempted to argue that when he was striking Melissa in the Domestic Violence incidents, particularly during the second incident, he was merely "playing around." The State argued that Gipson threatening Melissa with a weapon established that Gipson was not "joking."

{¶51} Gipson counters the State's arguments by contending that the pellet gun was irrelevant and prejudicial. Notably, while Gipson initially objected to entering the pellet gun into evidence when Patrolman Huber testified, he did not object to the pellet gun's admission into evidence at the close of the State's case. Notwithstanding Gipson's failure to object at that time, we cannot find that the trial court abused its discretion by allowing the State to present the pellet gun. While the pellet gun *could* have been prejudicial, it also *could* have been used to establish Gipson's motive and intent as argued by the State, and we cannot find

that the trial court abused its discretion in allowing its admission.[3]  However, even if we did find that the trial court abused its discretion, we cannot find that the introduction of the pellet gun was so prejudicial that it tainted the entire trial. Therefore, Gipson's second assignment of error is overruled.

{¶52} Accordingly, for the foregoing reasons Gipson's assignments of error are overruled and the judgment of the Allen County Common Pleas Court is affirmed.

*Judgment Affirmed*

**PRESTON and ROGERS, J.J., concur.**

**/jlr**

---

[3] The jury was also instructed that the other acts evidence could not be used to show action in conformity therewith, but rather for "motive, intent, identity, purpose, or modus operandi."  (July 7, 2015, Tr. at 49).