[Cite as *In re J.D.*, 2023-Ohio-250.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN RE:

J.D.,

ADJUDGED DELINQUENT CHILD.

CASE NO. 1-22-20

O P I N I O N

Appeal from Allen County Common Pleas Court
Juvenile Division

Trial Court No.  2020 JG 36777

Judgment Affirmed

Date of Decision:  January 30, 2022

APPEARANCES:

*Linda Gabriele* for Appellant

*John R. Willamowski, Jr.* for Appellee

**ZIMMERMAN, J.**

{¶1} Delinquent Child, J.D. brings this appeal from the November 16, 2021 and February 28, 2022 judgment entries of the Allen County Court of Common Pleas, Juvenile Division. For the reasons that follow, we affirm.

{¶2} On January 19, 2020, Danielle Lamont Jackson (nicknamed "D.J.") attended a Christmas Party hosted by his employer at Milano Café. At the conclusion of the Christmas Party, D.J. and some of his co-workers went to Pappy's Lounge ("Pappy's") located at 1000 West North Street, Lima, Allen County, Ohio. Following the last call for alcohol, D.J. left the lounge to wait for his ride. While waiting, D.J. was approached by two unknown black males demanding money from him at gunpoint. When D.J. told them he did not have any money, he was shot. D.J. was ultimately transported to the hospital where he died as a result of his gunshot wounds. After a lengthy investigation by the Lima Police Department, J.D., a 15-year-old minor, confessed to shooting D.J. and later selling the .22 caliber firearm that he used in the commission of the crimes to an unknown person.

{¶3} On April 17, 2020, a complaint was filed in the Allen County Common Pleas Court, Juvenile Division, alleging J.D. to be a "[d]elinquent child" for committing acts that if charged as an adult would constitute Murder in violation of R.C. 2903.02(A), an unclassified felony, with a firearm specification under R.C. 2941.145(A). Further, given that J.D. was 15 years old at the time of the offense,

the State requested a permissive bindover to adult court under R.C. 2152.12(B) in the complaint.

{¶4} On April 21, 2020, J.D. filed a motion to suppress his statements in the trial court. J.D. supplemented his motion in May and July, 2020.

{¶5} On July 29, 2020, the juvenile court determined that J.D. was eligible for a discretionary transfer to the adult court based upon his age at the time of the offenses and the offenses charged. On December 4, 2020, the juvenile court held an amenability hearing balancing the factors outlined in R.C. 2152.12 as to a transfer. Ultimately, the juvenile court determined that the factors weighed against his case being transferred to the adult court. Thus, the juvenile court retained jurisdiction over J.D.

{¶6} On December 30, 2020, the State filed its notice in the juvenile court requesting J.D. to be determined to be a serious youthful offender ("SYO") at disposition.

{¶7} On January 15, 2021, J.D. was indicted on three criminal charges including: Count One for Aggravated Murder in violation of R.C. 2903.01(B) and R.C. 2929.02(A), an unclassified felony; Count Two for Aggravated Robbery in violation of R.C. 2911.01(A)(1), (C), a first-degree felony; and Count Three for Tampering with Evidence in violation of R.C. 2921.12(A)(1), (B), a third-degree felony. The indictment included firearm specifications under R.C. 2941.145(A) as

to Counts One and Two. The indictment further alleged that J.D., being 15 years old at the time of the offenses, was subject to a SYO designation under R.C. 2152.11.

{¶8} On February 23, 2021, the juvenile court held a suppression hearing. Following the hearing, the juvenile court issued a judgment entry ordering the parties to submit written closing arguments. Thereafter, the juvenile court issued its judgment entry denying J.D.'s motions to suppress on April 27, 2021.

{¶9} On November 1, 2021, J.D.'s jury trial commenced. During the State's opening statement, certain improper remarks were made by the prosecutor to which J.D. objected. After a sustained objection, the trial court gave the jury a limiting instruction. Notwithstanding the instruction, J.D. moved for a mistrial. The juvenile court denied J.D.'s request for a mistrial and reiterated that it had previously given the jury a limiting instruction and would again instruct the jury, prior to deliberations, that opening and closing statements are not to be considered by the jury as evidence.

{¶10} On November 4, 2021, the jury found J.D. guilty of all three counts in the indictment including additional findings that J.D. was 15 years old at the time the offenses were committed under Counts One and Two. Further, the jury found J.D. guilty of the firearm specifications as to Counts One and Two.

{¶11} On November 16, 2021, the juvenile court filed its judgment entry of conviction accepting the jury's findings of guilt as to Counts One, Two, and Three as well as the jury's additional findings as to J.D.'s age and the firearm specifications, and ordered a pre-dispositional investigation.

{¶12} On February 17, 2022, the juvenile court proceeded to J.D.'s dispositional and sentencing hearing wherein it imposed a blended sentence. Specifically, for the adult portion of the blended sentence, the juvenile court determined that Counts One, Two, and Three did not merge for the purposes of sentencing. Thereafter, the juvenile court found that a mandatory prison term was required under Count One as well as the firearm specifications under Counts One and Two. However, the juvenile court found that a mandatory prison term was not required under Count Two. Further, the juvenile court determined that J.D. was not eligible for an adult sentence as to Count Three.

{¶13} Thereafter, the juvenile court sentenced J.D. to a mandatory prison term of 20 years to life under Count One along with a mandatory 3-year prison term for the firearm specification. Next, the juvenile court found that notwithstanding the juvenile court's discretion to impose an adult portion of a blended sentence under Count Two (and the firearm specification), it elected not impose an adult sentence. Further, the juvenile court ordered the adult portion of the SYO

dispositional sentence under Count One be stayed pending J.D.'s successful completion of the traditional juvenile dispositions ordered.

{¶14} For J.D.'s traditional juvenile disposition, the juvenile court ordered a commitment to the Department of Youth Services ("DYS") until he reaches age 21 under Count One. Further, J.D. was ordered to serve a mandatory three-year commitment (to DYS) for the firearm specification to be served prior to and consecutive to the commitment imposed under Count One. Then, the juvenile court committed J.D. to DYS for a minimum period of one year up and until age 21 under Count Two, and ordered that he serve the three-year commitment for the firearm specification to be served prior to and consecutive to the commitment imposed under Count Two. Finally, the juvenile court ordered J.D. to be committed to DYS for a minimum period of six months until age 21 under Count Three. The judgment entry was filed on February 24, 2022.

{¶15} J.D. filed a timely notice of appeal and asserts six assignments of error for our review. We will address his third assignment of error first, then his fourth assignment of error, followed by his fifth assignment of error, then his first and second assignments of error together, and finally his sixth assignment of error.

### Assignment of Error III

**The Juvenile Court Erred In Overruling The Child-Appellant's Motions To Suppress Statements And All Evidence Obtained Through Invalid Seizure As The Child-Appellant's Constitutional Rights Were Violated.**

**{¶16}** In his third assignment of error, J.D. argues that the trial court erred when it overruled his motion to suppress his statements made to law enforcement. Specifically, J.D. asserts that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights, and even if he did waive his rights, he was coerced by law enforcement into making his statement. Additionally, J.D. argues that he did not have access to his mother, Keshauna Lewis ("Lewis"), who was present at the police station while he was being questioned, to be present during his interview.

*Standard of Review*

**{¶17}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶ 32, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. We are required to accept the trial court's findings of fact if supported by competent, credible evidence. *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Burnside* at ¶ 8, citing *State v. McNamara*, 124 Ohio App.3d 706, 710 (4th Dist.1997). We therefore review the trial court's application of the law de novo.

*Analysis*

**{¶18}** The Fifth Amendment to the United States Constitution provides individuals with protection against self-incrimination. *See Chavez v. Martinez*, 538 U.S. 760, 765, 123 S.Ct. 1994, 2000 (2003). "'''Juveniles are entitled both to protection against compulsory self-incrimination under the Fifth Amendment and to *Miranda* warnings where applicable.'''" *In re R.S.*, 3d Dist. Marion No. 11-13-10, 2014-Ohio-3543, ¶ 15, quoting *In re K.W.*, 3d Dist. Marion No. 9-8-57, 2009-Ohio-3152, ¶ 12, quoting *State v. Thompson*, 7th Dist. Jefferson Nos. 98 JE 28 and 98 JE 29, 2001-Ohio-3528, *8 (Jan. 24, 2001), citing *In re Gault*, 387 U.S. 1, 55, 87 S.C.t. 1428, 1458 (1967).

**{¶19}** Here, the parties do not dispute that J.D. was in custody at the time his interview was conducted, or that J.D. was informed of his *Miranda* rights. Rather, the question is whether J.D. did in fact knowingly, intelligently, and voluntarily waive his *Miranda* rights.

**{¶20}** "To determine whether a suspect knowingly, intelligently, and voluntarily waived his *Miranda* rights, courts examine the totality of the circumstances." *State v. Baker*, 149 Ohio St.3d 1, 2016-Ohio-2708, ¶ 24 citing *State v. Clark*, 38 Ohio St.3d 252, 261 (1988). "When the suspect is a juvenile, the totality of the circumstances includes 'the juvenile's age, experience, education, background, and intelligence' as well as his 'capacity to understand the warnings

given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.'" *Id.* at ¶ 24, quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572 (1979). "A juvenile's access to parental, guardian or custodial advice also plays a role in assuring that the juvenile's waiver is knowing, intelligent, and voluntary." *Id.*, citing *In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, ¶ 96. However, a juvenile's confession is not rendered involuntary where the juvenile does not have a parent, guardian, or attorney present. *In re Watson*, 47 Ohio St. 3d 86, 89 (1989). Further, since J.D. also asserts coercion, we look at additional circumstances including "the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *In re M.H.*, 163 Ohio St.3d 93, 2020-Ohio-5485, ¶ 39, quoting *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, ¶ 77.

{¶21} The record before us supports that Detective Todd Jennings ("Jennings") interviewed J.D. at the police department on April 13, 2020 in relation to D.J.'s aggravated murder and aggravated robbery. Prior to the interview, Jennings explained *Miranda* rights to J.D., in detail, and then Jennings read J.D. the standard admonishment form, which J.D. signed. The entire process was recorded and admitted into evidence at the suppression hearing. (*See* State's Exs. 1, 2).

{¶22} Even though J.D. told Jennings that he had some difficulty reading, Jennings testified that J.D. did not appear to be low or below average intelligence

or to lack understanding. Furthermore, Jennings testified that he observed no learning disabilities. Importantly, J.D. never asked to speak to his parent, guardian, or an attorney before, during, or after his interview.[1] J.D.'s only reference to his mother during his interview with Jennings was in passing stating that she was at the hospital.

{¶23} Nevertheless, Jennings testified that he was notified that the mother was at the police station at some point, but he could not recall if the notification was *before* or *after* his interview of J.D. He testified it was obvious that it was not *during* the interview with J.D. because video of J.D.'s interview reveals that no one knocked on the interview-room door. Further, Jennings denied receiving any phone calls on his work-related cellphone during the interview, even though the defense alleged otherwise.[2]

{¶24} Lieutenant Brian Leary ("Leary"), Jennings's supervisor, also testified at the suppression hearing. Leary testified that when he came on station he was informed by staff that there was a person in the lobby with concerns regarding her son who was involved in an interview. Leary testified that Lewis, J.D.'s mother, asked to speak with J.D., and he told her no, since it was standard police policy not

---

[1] J.D.'s maternal grandmother, Betty Williams ("Williams"), obtained a guardianship over J.D. when he was an infant because his mother was sent to prison. Later, J.D. resided with his maternal aunt, Beverly Sims ("Sims"), until Sims passed away unexpectedly in 2018. However, at the time J.D. was interviewed, he was residing with Williams, his mother, and one of his younger siblings in his Williams's home.

[2] Jennings testified that his co-workers would have typically contacted him on his private cellphone.

to interrupt in-progress interviews. According to Leary, he never relayed any information as to J.D.'s mother being present to Jennings. Instead, Leary took Lewis's phone number and passed that information along to Investigator Kunkleman since he was the juvenile investigator.

{¶25} Lewis testified that she told the law-enforcement officers who were transporting J.D. to the police station that she wanted to be with him during his interview.[3] However, such information was never passed along to Jennings. According to Lewis, she had to wait for J.D.'s sister to take her to the police station since she did not have a ride. Nevertheless, when Lewis arrived at the station, she made it clear to the front-desk officer (Officer Blake Van Vorce ("Van Vorce")) that she wanted to be with J.D. while he was being questioned. However, Lewis testified that Van Vorce responded that it was not against the law to question a minor without a parent. Lewis testified that Leary spoke to her following the conclusion of J.D.'s interview to let her know that J.D. was being transported to the juvenile detention center at which time she provided him with her phone number. She further testified on cross-examination that J.D. was a smart kid who was raised to tell the truth.

{¶26} Importantly, even though J.D. spent approximately one hour and 10 minutes at the police department, his interview with Jennings only lasted for 37 minutes. During that time, J.D. was offered a variety of drink options and given

---

[3] Jennings and Leary were not present at Williams's home when the street officers located and picked-up J.D. for transport to the police station.

several bathroom breaks. No physical deprivation or maltreatment occurred nor did J.D. allege that any such conduct occurred.

{¶27} While J.D. argues that Jennings provided him "misleading information", no such "misleading information" appears in the record. Indeed, Jennings appealed to J.D.'s sense of honesty and guilt during the interview. The record is void of police overreaching, trickery, or deception. *See generally In re C.M.R.*, 2d Dist. Montgomery No. 27519, 2018-Ohio-110, ¶ 36-37. Moreover, J.D. was not harmed, threatened, or promised anything.

{¶28} In reviewing whether J.D. knowingly, intelligently, and voluntarily waived his *Miranda* rights, we note that J.D. was verbally explained his rights before he executed the written waiver form. Furthermore, after examining the testimonies of the witnesses together with the exhibits, J.D.'s age, experience with the juvenile justice system, education, background, intelligence, capacity to understand his Fifth Amendment rights, the consequence of waiving them, the length and intensity of his interview, the lack of maltreatment, and the lack of threats, we conclude that the trial court did not err in determining that J.D.'s confession was knowing, intelligent, and voluntarily made.

{¶29} Accordingly, J.D.'s third assignment of error is overruled.

**Assignment of Error IV**

**The Juvenile Court Erred In Overruling The Child-Appellant's Motion For Mistrial As The Opening Argument By The State Of**

**Ohio Created A Manifest Miscarriage Of Justice Violating The Child-Appellant's Right To A Fair Trial.**

**{¶30}** In his fourth assignment of error, J.D. argues that he was deprived of a fair trial when the trial court failed to declare a mistrial following improper statements made by the prosecution during its opening statement. Specifically, J.D. asserts that the prosecution engaged in misconduct by referencing J.S.'s confession (J.D.'s co-defendant) during opening statement.

*Standard of Review*

**{¶31}** "'The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.'" *State v. Mayse*, 3d Dist. Marion No. 9-16-50, 2017-Ohio-1483, ¶ 14 quoting *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001). A mistrial should only be granted when a fair trial is no longer possible, and it should not be granted merely due to some error or irregularity. *Treesh* at 480 and *State v. Southam*, 3d Dist. Henry No. 7-12-04, 2012-Ohio-5943, ¶ 24. Essentially, the "inquiry on a motion for a mistrial is whether the substantial rights of the accused were adversely or materially affected." *State v. Goerndt*, 8th Dist. Cuyahoga No. 88892, 2007-Ohio-4067, ¶ 21. *See also Southam* at ¶ 24.

*Analysis*

**{¶32}** Here, J.D. first challenges the following comment made by the prosecution during the State's opening statement. Specifically, the State said:

-13-

> One (1) of the persons of interest that quickly comes to the Lima Police Department's attention is, as I mentioned, this [J.S.], also fifteen (15) years of age, young African-American male. Law enforcement officers are able to identify, from the video, and other evidence, that the clothing [J.S.] had on matches the videos from this night of the individuals walking to the Bar and fleeing from the Bar. They also know that [J.S.] is a frequent visitor of nine-forty-one (941) West Wayne. That is, in fact, where his girlfriend resided.
>
> Several o-, pe-, I apologize. After sometime, [J.S.] is brought in for an unrelated incident. He's being questioned by detectives and this shooting is brought up. At that time, [J.S.] *confesses that he, along with [J.D.], did approach Pappy's Bar-,....*

(Emphasis added.) (Nov. 1, 2021 Tr., Vol. II, at 288). Thereafter, J.D. objected on the basis that the prosecutor was giving testimony as to the admission of a co-defendant. (*Id.*). After a side bar, the trial court instructed to the jury as follows:

> The Court is going to sustain the objection. The Court is going to instruct the Jury to, um, not consider any statement that [the prosecutor] just stated in regards to any co-defendant, and what that co-defendant may or may not have said. That's not at issue right now, so any statement in regards to what may or may not have been said, or may or may not have been, um, relayed to other individuals is to not be considered in this case. Does everybody understand that? Okay. And, again, this is not evidence, it's not testimony, but what [the prosecutor] just said is not to be considered. That's *my* instruction and *my* Order. Okay? [Prosecutor], you may continue.

(Emphasis sic.) (*Id.* at 290). Thereafter, at the conclusion of the first day of trial and after the jury was excused, J.D.'s trial counsel moved for a mistrial on the basis that the prosecutor had implied that J.S. (J.D.'s co-defendant) admitted his

-14-

involvement in the crimes and also implicated J.D. in violation of the *Bruton* rule.[4] (*Id.* at 350-351). Ultimately, the trial court denied J.D.'s request for a mistrial. Thus, to this portion of his argument we apply an abuse of discretion standard of review.

**{¶33}** Next, J.D. argues that State's Exhibit 55 (the edited version of Jennings interview with J.D.) should have been redacted to remove any reference to J.S.'s interview (by Jennings) during J.D.'s interview. (*Id.* at 5-9). The trial court denied J.D.'s request to order redaction, but instructed the parties to review the exhibit to determine if they could reach an agreement to what *if any* redaction was necessary. (*Id.* at 9). The following day, State's Exhibit 55 was admitted as an exhibit *without objection*. (Nov. 3, 2021 Tr., Vol. I, at 120-122). Hence, we apply plain error to this portion of J.D.'s argument. *See* Crim.R. 52(B).

**{¶34}** For plain error to apply, the trial court must have deviated from a legal rule, the error must be plain, i.e., an obvious defect in the proceeding, and the error must have affected the defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "[T]o demonstrate that the trial court's error affected a substantial right, the defendant must establish that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been

---

[4] The *Bruton* Rule stands for the proposition that a criminal defendant's Sixth Amendment right to cross-examine witnesses against him is violated when an accomplice's out-of-court confession is introduced at trial.

-15-

otherwise." *State v. Sutton*, 3d Dist. Seneca No. 13-21-11, 2022-Ohio-2452, ¶ 50. We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. Under Crim.R. 52(B), "the defendant bears the burden of demonstrating that a plain error affected his substantial rights." (Emphasis sic.) *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 14. Nevertheless, we note, regardless of what standard of review we apply, the outcome is the same.

{¶35} Here, J.D. contends that the trial court violated the rule announced in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620 (1968), and adopted by the Ohio Supreme Court in *State v. Moritz*, 63 Ohio St.2d 150 (1980) by failing to declare a mistrial based upon prosecutorial misconduct with respect to the prosecutor's opening statement and by not ordering redaction of State's Exhibit 55.

*Declaration of a Mistrial*

{¶36} Importantly, "'[a] mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected * * *.'" *State v. A.M.*, 8th Dist. Cuyahoga No. 106400, 2018-Ohio-4209, ¶ 23, quoting *State v. Reynolds*, 49 Ohio App.3d 27 (2d Dist.1988), paragraph two of the syllabus. "'Mistrials need be declared only when the ends of justice so require and a fair trial is no longer

possible.'" *State v. Hansen*, 3d Dist. Seneca No. 13-12-42, 2013-Ohio-1735, ¶ 58, quoting *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). When we consider whether J.D. "was deprived of a fair trial, we must determine whether, absent the error or irregularity, 'the jury would have found [him] guilty beyond a reasonable doubt.'" *State v. Junod*, 3d Dist. Mercer No. 10-18-08, 2019-Ohio-743, ¶ 44, quoting *State v. Morris*, 10th Dist. Franklin Nos. 18AP-208 and 18AP-209, 2018-Ohio-5252, ¶ 44, citing *State v. Maurer*, 15 Ohio St.3d 239, 267 (1984). "To determine whether the error resulted in prejudice, we must consider (1) the nature of the error, (2) whether an objection was made, (3) whether the trial court provided corrective instructions, and (4) the strength of the evidence against the defendant." *Id.*, citing *Morris* at ¶ 44.

*Prosecutorial Misconduct*

{¶37} Because J.D.'s argument is predicated on prosecutorial misconduct, we note that [t]he test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights." *State v. Liles*, 3d Dist. Allen No. 1-14-61, 2015-Ohio-3093, ¶ 31, citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984), (citation omitted). "'To establish prejudice, a defendant must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different. Thus, "[n]ot every intemperate remark by counsel can be a basis for

reversal.'"'" *Id.*, quoting *State v. Porter*, 4th Dist. Meigs No. 10CA15, 2012-Ohio-1526, ¶ 20, quoting *Landrum*, 53 Ohio St.3d at 112. "In making this determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995), (citations omitted).

*The Bruton Rule*

**{¶38}** In *Bruton*, the Supreme Court of the United States found that the introduction of the accomplice's out-of-court confession at defendant's trial violated the defendant's Sixth Amendment right to cross-examine witnesses against him. *Id.* at 126. In *Moritz*, the Supreme Court of Ohio adopted the holding in *Bruton* and held that:

> An accused's right of cross-examination secured by the confrontation clause of the Sixth Amendment is violated in a joint trial with a non-testifying codefendant by the admission of extrajudicial statements made by the codefendant inculpating the accused.

*Moritz* at paragraph one of the syllabus, citing *Bruton*. In *Moritz*, the Supreme Court of Ohio further stated:

> '[T]he *Bruton* rule applies with equal force to all statements *that tend significantly to incriminate a co-defendant*, whether or not he is actually named in the statement. The fact that the incrimination amounts to a link in a chain of circumstances rather than a direct accusation cannot dispose of the applicability of the *Bruton* rule. Just as one can be convicted on circumstantial evidence, one can be circumstantially accused.'

-18-

(Emphasis added.) *Moritz* at 155, quoting *Fox v. State*, 179 Ind.App. 267, 384 N.E.2d 1159 (1979).

{¶39} The Supreme Court of the United States again revisited the topic in *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702 (1987), *superseded by statute on other grounds*. In *Richardson*, the court held that the Confrontation Clause is not violated by the admission of a nontestifying co-defendant's confession with a proper limiting instruction when the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence. *Id.* at 211. The court further limited the holding of *Bruton* by distinguishing between a confession that is "incriminating on its face" and, therefore, in violation of *Bruton* from a confession that amounts to "evidence requiring linkage" in that it may become incriminating in respect to a co-defendant "only when linked with evidence introduced later at trial." The court refused to extend the rule of *Bruton* to confessions falling within the linkage category.

{¶40} The Supreme Court of Ohio adopted the rule of *Richardson* for the Confrontation Clause of Section 10, Article I of the Ohio Constitution with respect to redacted confessions. *In re Watson*, 47 Ohio St.3d at 91. The court did not address the underlying rationale espoused in *Richardson* limiting the holding in *Bruton* or what difference, if any, remained between *Richardson* and *Moritz* for the purposes of Section 10, Article I of the Ohio Constitution.

**{¶41}** Even if we were to assume without deciding that there exists a divergence between the approach of the Supreme Court of Ohio and the Supreme Court of the United States with respect to the confrontation clauses, we find no violation of the *Bruton* rule here. We conclude that the statements made by the prosecutor during its opening statement (referencing J.S.'s statement) does not tend to *significantly incriminate* J.D. in the offenses of aggravated murder and aggravated robbery. On the contrary, J.D.'s admissions to Jennings confirmed his presence at Pappy's Lounge on January 20, 2020 and his involvement in the aggravated murder and aggravated robbery of D.J.

**{¶42}** Furthermore, even if we had of concluded otherwise, the State's case against J.D. was not just based on circumstantial evidence, but rather on J.D.'s admissions. As such, the prosecutor's reference to J.S.'s statement does not operate as a "link in a chain of circumstances" so as to incriminate J.D. Moreover, J.D.'s detailed account of the aggravated murder and aggravated robbery incriminated him, not the prosecutor's limited reference to a partial and incomplete statement made by J.S. Thus, we do not find a violation of the *Bruton* rule under the facts presented.

**{¶43}** Also, within this assignment of error, J.D. argues that he was prejudiced by Jennings during the interview in State's Exhibit 55. Specifically, during J.D.'s interview, Jennings stated, "I talked to [J.S.] today and that's why

you're up here." Despite his contention to the contrary, what was said by Jennings does not constitute a co-defendant statement under *Bruton* for the same reasons discussed above.

{¶44} Finally, the trial court correctly gave a limiting instruction to the jury in regards to the prosecutor's opening statement and again reiterated it after the close of evidence that the jury is to base its verdict on the evidence, which did *not* include the statements of counsel.

{¶45} Consequently, we conclude that the trial court did not err by denying J.D.'s motion for a mistrial or with respect to its evidentiary determination.

{¶46} Accordingly, J.D.'s fourth assignment of error is overruled.

**Assignment of Error V**

**The Juvenile Court Erred In Allowing Hearsay Statement Evidence As A Dying Declaration In Violation Of The Child-Appellant's Constitutional Right Of Confrontation.**

{¶47} In his fifth assignment of error, J.D. argues that the trial court erred by admitting D.J.'s statements made under a hearsay exception. J.D. maintains that the trial court should not have admitted D.J.'s statement because the State, as the proponent of the statement, failed to prove that D.J. believed his death was imminent in order to admit the statement. Thus, he asserts his rights were violated because he had no right to cross-examine D.J. at the time of trial.

*Standard of Review*

**{¶48}** Generally, a trial court has broad discretion with respect to the admission of evidence. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001), citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). Accordingly, we will not disturb the trial court's evidentiary rulings absent an abuse of discretion that produces a material prejudice to the aggrieved party. *State v. Gipson*, 3d Dist. Allen No. 1-15-51, 2016-Ohio-994, ¶ 48, citing *State v. Roberts*, 9th Dist. Summit No. 21532, 2004-Ohio-962, ¶ 14. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in reaching its ruling. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

**{¶49}** However, we review hearsay-evidentiary rulings that implicate the Confrontation Clause under a de novo standard of review. *See State v. Armour*, 3d Dist. Allen Nos. 1-22-05 and 1-22-06, 2022-Ohio-2717, ¶ 37, citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97 (citations omitted). "De novo review is independent, without deference to the lower court's decision." *State v. Hudson*, 3d Dist. Marion No. 9-12-38, 2013-Ohio-647, ¶ 27, citing *Ohio Bell Tel. Co. v. Pub. Util. Comm. of Ohio*, 64 Ohio St.3d 145, 147 (1992).

*Analysis*

{¶50} The Sixth Amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]" The United States Supreme Court has held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 1365-1366 (2004).

{¶51} Thus, according to *Crawford*, the initial analysis to be made in determining whether a defendant's right to confrontation has been violated by the admission of out-of-court statements that are not subject to cross-examination "is not whether [the statements] are reliable but whether they are testimonial in nature." *Toledo v. Sailes*, 6th Dist. Lucas No. L-08-1135, 2008-Ohio-6400, ¶ 13, citing *Crawford* at 61, 124 S.Ct. at 1370. To determine whether a statement is testimonial or nontestimonial, we inquire whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the case. *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, paragraph two of the syllabus. While testimonial statements under *Crawford* are not subject to the exceptions to the hearsay rules, they may nevertheless be admissible under one of the two historical exceptions to the

Confrontation Clause recognized by the U.S. Supreme Court–forfeiture by wrongdoing and dying declarations. *State v. Carter*, 8th Dist. Cuyahoga No. 106462, 2018-Ohio-3671, ¶ 31, citing *Giles v. California*, 554 U.S. 353, 358, 128 S.Ct. 2678, 2682-2683 (2008).

{¶52} Evid.R. 804(B)(2) codifies the dying-declarations rule (now titled "[s]tatement under belief of impending death") and provides in its pertinent part that "[i]n a prosecution for homicide * * *, a statement made by a declarant, while believing that his [] death was imminent, concerning the cause or circumstances of what the declarant believed to be his [] impending death."

{¶53} At trial, Ronald Jones ("Jones") testified that he was at Pappy's Lounge on the night when D.J. was shot. Jones testified that he, his fiancé, the bartender, and several other patrons were inside the bar at closing time. Jones testified that D.J. exited the bar through the backdoor to wait on his ride. According to Jones, he heard a scream, and then someone pounded on the back door. Jones grabbed a baseball bat and exited out the door finding D.J. (in the back parking lot) laying on his back. Jones testified that D.J. looked scared. He was trying talk, but had difficulty speaking. Jones testified, "[D.J.] said he'd been shot-…." (Nov. 1, 2021 Tr., Vol. II, at 319). The defense objected on the basis that the statement constituted hearsay evidence. (*Id.*). The State countered by arguing that D.J.'s statements constituted a dying declaration. (*Id.*). The trial court deferred ruling on

the defense's continuing objection to permit the State to lay additional foundation as to D.J.'s demeanor and state of mind at the time Jones encountered him. (*Id.* at 319-321). Thereafter, Jones testified that it was 13-14 minutes before the ambulance arrived. Jones testified he asked D.J. questions because he (Jones) was concerned that D.J. might pass away. (*Id.* at 323). Jones testified "[D.J.] told [him] he was going to die." (*Id.* at 324). Ultimately, the trial court overruled the defenses objection.

{¶54} Here, D.J.'s statement is not testimonial because an objective witness under the same circumstances would not have reasonably believed the statement would be used later for trial. *See State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 162. It is clear to us that D.J.'s statement was made immediately after he was shot, while he was barely conscious laying on the ground outside of the bar. Under such circumstances, his statements are not testimonial. Thus, we conclude that his statement falls under Evid.R. 804(B)(2) and that the State established that D.J. made his statements believing his death was imminent through the testimony given.

{¶55} Accordingly, we conclude that the trial court did not err in its evidentiary determination, and J.D.'s fifth assignment of error is overruled.

**Assignment of Error I**

**The Child-Appellant's Adjudication As A Delinquent Child Was Based Upon Insufficient Evidence.**

**Assignment of Error II**

**The Child-Appellant's Adjudication As A Delinquent Child For Robbery Is Against The Manifest Weight Of The Evidence.**

{¶56} In his first and second assignments of error, J.D. challenges the sufficiency and weight of the evidence supporting his delinquency adjudications and convictions for aggravated murder and aggravated robbery each with a firearm specification.[5] In particular, in his first assignment of error, J.D. argues that the State presented insufficient evidence as to the issue of identity. In his second assignment of error, J.D. argues that the weight of the evidence demonstrates that the jury lost its way since no witness could identify J.D. and because the State failed to establish the "causation" of J.D.'s death.

*Standard of Review*

{¶57} Initially, it is important we emphasize that "[t]he standards for evaluating the weight and sufficiency of the evidence in juvenile adjudications are the same as the standards used in adult criminal cases." *In Re: A.K.*, 1st Dist. Hamilton No. C-210178, 2021-Ohio-4199, ¶ 22 citing *In re: A.P.*, 1st Dist. Hamilton Nos. C-190551, C-190552, and C-190553, 2020-Ohio-5423, ¶ 9, 18. Regarding J.D.'s sufficiency challenge, "[w]hether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997);

---

[5] Significantly, J.D. does not challenge the sufficiency of the evidence with regard to his tampering with evidence adjudication and conviction. Consequently, we will not address it.

*State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, ¶ 7.  Therefore, our review is de novo.  *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, ¶ 3.  In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.  *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89, 102, (1997), fn. 4 and following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979).  "In essence, sufficiency is a test of adequacy."  *Thompkins* at 386.

{¶58} Contrast with the determination of whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier-of-fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"  *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  A reviewing court must, however, allow the trier-of-fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses.  *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).  When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against

-27-

the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

*Sufficiency-of-the-Evidence Analysis*

**{¶59}** At trial, J.D. was convicted of aggravated murder in violation of R.C. 2903.01(B), which provides that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery * * *."

**{¶60}** Further, J.D. was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), which provides that "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[]".

**{¶61}** Importantly, J.D. does not dispute any of the underlying elements of any of the offenses of which he was convicted. Rather, since he disputes only the issue of identity as to his adjudications and convictions, we need only address that element in each of the offenses.

**{¶62}** "'It is well settled that in order to support a conviction, the evidence must establish beyond a reasonable doubt the identity of the defendant as the person who actually committed the crime at issue.'" *State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 13, quoting *State v. Johnson*, 7th Dist. Jefferson No. 13 JE 5, 2014-Ohio-1226, ¶ 27, citing *State v. Collins*, 8th Dist. Cuyahoga No. 98350, 2013-Ohio-488, ¶ 19 and *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 11.

**{¶63}** In his sufficiency challenge, J.D. argues that a rationale trier of fact could not have found that he was involved in the robbery and shooting of D.J. since no one identified the perpetrators, other than, D.J. who is deceased.

**{¶64}** On the contrary, the record contradicts J.D.'s argument because the prosecution presented evidence that J.D. *admitted* to attempting to rob D.J. before shooting him with a .22 caliber revolver. Thus, the State established that J.D. was responsible for the aggravated murder and aggravated robbery of D.J. based upon his own admission.

**{¶65}** Accordingly, after viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could conclude beyond a reasonable doubt that J.D. was a person who committed the offenses of aggravated murder and aggravated robbery based upon his own admission.

**{¶66}** Thus, J.D.'s adjudications and convictions are based upon sufficient evidence.

*Manifest-Weight-of-the-Evidence Analysis*

**{¶67}** J.D.'s manifest-weight-of-the-evidence challenge is nearly identical to his sufficiency-of-the-evidence argument regarding identity. That is–J.D. argues that, there is no evidence identifying him as the person who committed the offenses of aggravated murder and aggravated robbery, and thus, his adjudications and convictions for aggravated murder and aggravated robbery are against the manifest weight of the evidence to establish that J.D. was the person who committed the offenses. Additionally, J.D. argues that the State failed to establish "causation", although he never identifies regarding which offense.[6]

**{¶68}** Significantly, J.D.'s manifest-weight argument is founded upon the premise that we would sustain his first, third, and fifth assignments of error resulting in the suppression of J.D.'s statements to Jennings, the exclusion of D.J.'s statements to Jones, and determining that there was insufficient evidence to support his involvement (i.e., identity) as to Counts One and Two. Since we have determined that the trial court did not err by admitting J.D.'s confession, that D.J.'s

---

[6] To the extent the second portion of J.D.'s argument (as to "causation") appears to sound in sufficiency, we need not address his argument since J.D.'s assignment of error concerns the manifest weight of the evidence. *See* App.R. 12(A)(1)(b); App.R. 16(A)(3).

statements (to Jones) were not hearsay, and that J.D.'s identity was established by his admission, his argument lacks merit.

{¶69} After reviewing the entire record, we will not say that the evidence weighs heavily against J.D.'s aggravated-murder and aggravated-robbery adjudications and convictions. Therefore, we will not conclude that the jury clearly lost its way, which created a manifest miscarriage of justice such that J.D.'s convictions under Counts One and Two must be reversed and a new trial ordered.

{¶70} Accordingly, we overrule J.D.'s first and second assignments of error.

### Assignment of Error VI

**The Juvenile Court Erred In Failing to Merge The Convictions Of Aggravated Murder And Aggravated Robbery.**

{¶71} In his sixth assignment of error, J.D. argues that the trial court erred by not merging his aggravated-murder and aggravated-robbery convictions since the offenses were allied offenses of similar import. Specifically, J.D. asserts that the offenses of aggravated murder and aggravated robbery should have merged for the purpose of sentencing because they were committed at the same time and involve the same animus.

*Standard of Review*

{¶72} "'Whether offenses are allied offenses of similar import is a question of law that this court reviews de novo.'" *State v. Cartlidge*, 3d Dist. Seneca No. 13-18-33, 2019-Ohio-1283, ¶ 26, quoting *State v. Frye*, 3d Dist. Allen No. 1-17-30,

2018-Ohio-894, ¶ 128. The most recent test for merger of multiple offenses was set forth by the Supreme Court of Ohio in the case of *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995.

{¶73} Significantly, J.D. did not raise his merger argument in the trial court at the time of sentencing. Thus, he has failed to preserve this issue at the trial-court level for appeal, and consequently, we review whether his offense are allied offenses of similar import for plain error. *See State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 28 ("the failure to raise the allied offense issue at the time of sentencing forfeits all but plain error"). *See also* Crim.R. 52(B).

{¶74} For plain error to apply, the trial court must have deviated from a legal rule, the error must be plain, i.e., an obvious defect in the proceeding, and the error must have affected the defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "[T]o demonstrate that the trial court's error affected a substantial right, the defendant must establish that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise." *State v. Sutton*, 3d Dist. Seneca No. 13-21-11, 2022-Ohio-2452, ¶ 50. We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. Under Crim.R. 52(B), "the defendant bears the burden of demonstrating that a plain error affected his

substantial rights." (Emphasis sic.) *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 14.

{¶75} The Supreme Court of Ohio, in *State v. Bailey*, ___Ohio St.3d. ___, 2022-Ohio-4407, recently reiterated the heightened standards to be met when recognizing plain error, stating, "intervention by a reviewing court is warranted only under *exceptional circumstances* to prevent injustice." (Emphasis added.) *Id.* at ¶ 8, citing *Long*, at paragraph three of the syllabus.

*Analysis*

{¶76} "[J]uveniles are entitled to the same constitutional double-jeopardy protections as adults" and "juvenile courts must conduct the same double-jeopardy analysis in delinquency proceedings that other courts apply in adult criminal proceedings." *In re A.G.*, 148 Ohio St.3d 118, 2016-Ohio-3306, ¶ 1. This includes application of Ohio's merger statute (i.e., R.C. 2941.25), which codifies the constitutional double jeopardy protection against multiple punishments for the same offense. *Id.* at ¶ 11-12, 15; *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, at ¶ 10, 12. R.C. 2941.25 provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a

separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶77}** In evaluating whether allied offenses must be merged into a single conviction under R.C. 2941.25(A), the trial court "must first take into account the conduct of the [juvenile]. In other words, how were the offenses committed?" *Ruff* at 25. "A juvenile whose conduct supports multiple offenses may be subject to terms of commitment for all the offenses if any one of the following is true: '(1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.'" *In re A.G.* at ¶ 12, quoting *Ruff* at paragraph three of the syllabus. Indeed, this comports with what the Supreme Court of Ohio has termed as the "'heightened goals of rehabilitation and treatment'" of the juvenile-court system in Ohio. *Id.* at ¶ 14, quoting *State v. D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, ¶ 38.

**{¶78}** Here, J.D. contends that the offenses were the result of a single act and animus. That is–the offenses are so linked so as to constitute allied offenses of similar import. Thus, the aggravated-murder and aggravated-robbery charges should have merged.

**{¶79}** However, the Supreme Court of Ohio has concluded "aggravated murder, as defined in R.C. 2903.01, is not an allied offense of similar import to

aggravated robbery, as defined in R.C. 2911.01." *State v. Bickerstaff*, 10 Ohio St.3d 62, 66 (1984). Even though *Bickerstaff* predates *Ruff*, the same conclusion is true under the test set forth in *Ruff*. Significantly, J.D. expressed his animus for shooting D.J. (i.e., the aggravated-murder charge) in his interview when he stated that he (J.D.) shot D.J. after J.S. shot first and that ultimately the shooting (according to J.D.) was based upon loyalty. J.D.'s stated the reason (for the aggravated-robbery charge) was based upon J.S. desire to rob D.J. Thus, J.D.'s aggravated-murder and aggravated-robbery charges were based upon separate animuses.

{¶80} Thus, the trial judge acted within the sentencing authority of R.C. 2941.25(B) when he sentenced J.D. separately on the adjudications and convictions for aggravated murder and aggravated robbery.

{¶81} Consequently, the trial court did not err by not merging J.D.'s aggravated-murder adjudication and conviction with his aggravated-robbery adjudication and conviction for purposes of disposition and sentencing.

{¶82} Accordingly, J.D.'s sixth assignment of error is overruled.

{¶83} Having found no error prejudicial to the delinquent child herein in the particulars assigned and argued, we affirm the judgment of the juvenile court.

*Judgment Affirmed*

**MILLER, P.J. and SHAW, J., concur.**

**/jlr**